IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE STATE OF ALABAMA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| PHH MORTGAGE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## CONSENT JUDGMENT

WHEREAS, Plaintiffs, the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, Wisconsin, Wyoming, the Commonwealths of Kentucky, Massachusetts, Pennsylvania and Virginia, and the District of Columbia (collectively, the "Attorneys General" or "Plaintiffs") filed their Complaint on January 3, 2018, alleging that PHH Mortgage Corporation ("PHH," "Defendant" or "Servicer") either itself or through its affiliates or subsidiaries violated, among other laws, the Unfair and Deceptive Acts and Practices laws of the Plaintiffs' States and the Consumer Financial Protection Act of 2010;

WHEREAS, the Parties have agreed to resolve their claims without the need for litigation;

WHEREAS, the Attorneys General and Defendant enter into this Consent Judgment with the understanding that the State Mortgage Regulators have contemporaneously entered into a Settlement Agreement and Consent Order with PHH (the "State Mortgage Regulators' Consent Order") in coordination with this Consent Judgment in order to resolve findings identified in the course of the Multi-State Examination of Defendant PHH.

WHEREAS, Defendant, by its attorneys, have consented to entry of this Consent Judgment without trial or adjudication of any issue of fact or law and to waive any appeal if the Consent Judgment is entered as submitted by the parties;

WHEREAS, Defendant, by entering into this Consent Judgment, does not admit any allegations of wrongdoing or violations of applicable laws, regulations, or rules governing the conduct and operation of its servicing business, other than those facts of the Complaint deemed necessary to the jurisdiction of this Court;

WHEREAS, the intention of the Attorneys General in effecting this settlement is to remediate harms allegedly resulting from the alleged unlawful conduct of the Defendant, either itself or through its affiliates or subsidiaries;

AND WHEREAS, Defendant has agreed to waive service of the Complaint and Summons and hereby acknowledge the same;

NOW THEREFORE, without trial or adjudication of issues of fact or law, without this Consent Judgment constituting evidence against Defendant except as otherwise noted, and upon consent of Defendant, the Court finds that there is good and sufficient cause to enter this Consent Judgment, and that it is therefore ORDERED, ADJUDGED, AND DECREED:

## I.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. §§ 5552 and 5565, and over Defendant.  The Complaint states a claim upon which relief may be granted against Defendant.  Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and 12 U.S.C. § 5564(f).

## II.    SERVICING STANDARDS

2.    Defendant shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms.

3.    Defendant shall implement the Servicing Standards no later than January 1, 2018 or as otherwise stated in Exhibit A, or the date on which this Consent Judgment has been entered by the Court, whichever is later ("Implementation Date").

## III.    FINANCIAL TERMS

4.    *Settlement Amount.*  Defendant shall pay forty-five million, two hundred and seventy-nine thousand, seven hundred and twenty-five dollars ($45,279,725), which shall be known as the "Settlement Amount," and which shall be distributed in the manner and for the purposes specified in this Consent Judgment and in Exhibit B.

5.    The Settlement Amount is comprised of: (a) Payments to Foreclosed and Referred Borrowers; (b) Attorneys' Fees and Costs payable to the Investigating Attorneys General; and (c) Administrative Penalty payable to the State Mortgage Regulators further defined in Paragraph 8.

6.    *Payments to Foreclosed and Referred Borrowers.*  In accordance with written instructions from the Executive Committee, established in Paragraph 12, and for the purposes set forth in the State Mortgage Regulators' Consent Order and Exhibit B of this Consent Judgment, Defendant shall transfer to the Settlement Administrator appointed under Exhibit B thirty-one

million, four hundred and fifty-six thousand, two hundred and ten dollars ($31,456,210) (the "Borrower Payment Amount") to enable the Settlement Administrator to provide cash payments to (a) borrowers whose loans were serviced by PHH at the time the foreclosure was completed and whose homes were sold or taken in foreclosure between and including January 1, 2009, and December 31, 2012, or (b) all other borrowers whose loans were serviced by PHH and referred to foreclosure during that same time period and not accounted for in (a) above; who submit claims allegedly arising from the Covered Conduct (as that term is defined in Exhibit C hereto); and who otherwise meet criteria set forth by the Executive Committee; and to pay the reasonable costs and expenses of the Settlement Administrator, including taxes and fees for tax counsel, if any.  Defendant shall also pay or cause to be paid any additional amounts necessary to pay claims, if any, of borrowers whose data is provided to the Settlement Administrator by Defendant after Defendant warrants that the data is complete and accurate pursuant to Paragraph 3 of Exhibit B.  The Borrower Payment Amount and any other funds provided to the Settlement Administrator for these purposes shall be administered in accordance with the terms set forth in Exhibit B.  Defendant shall pay the Borrower Payment Amount by electronic funds transfer, pursuant to written instructions to be provided by the Executive Committee into an account established in accordance with this Paragraph 6, within seven (7) days of receiving notice that the account has been established or within seven (7) days of the Date of Entry of this Consent Judgment, whichever is later.  After Defendant has made the required payments, Defendant shall no longer have any property right, title, interest or other legal claim in any funds.  The account established by this Paragraph 6 is intended to be a Qualified Settlement Fund within the meaning of Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.

7.      *Attorneys' Fees and Costs*.  Defendant shall pay to the Investigating Attorneys General a total of five million dollars ($5,000,000), to be used for attorney's fees, investigative costs and fees, future expenditures relating to the investigation and prosecution of cases involving fraud, unfair and deceptive acts and practices, and other illegal conduct related to financial services or state consumer protection laws to the extent practicable or as otherwise agreed to by law.  The $5,000,000 shall be distributed in accordance with Exhibit D, and such payments shall be made to the State Attorneys General of Arizona, California, Colorado, Connecticut, Florida, Illinois, Iowa, Nevada, North Carolina, Ohio, Texas, and Washington. Payment shall be made within ten (10) calendar days of Defendant's receipt of written payment processing instructions from each Investigating Attorney General.

8.      *Administrative Penalty*.  As required by the State Mortgage Regulators' Consent Order, Defendant shall pay eight million, eight hundred and twenty-three thousand, five hundred and fifteen dollars ($8,823,515) as an administrative penalty.  Payment shall be made in accordance with the terms of the State Mortgage Regulators' Consent Order.

## IV.      SERVICING STANDARDS COMPLIANCE TESTING AND REPORTING

9.      *Internal and/or External Compliance Testing*.  Servicer shall conduct transactional testing and compliance/controls testing, either internally and/or by retaining the services of a third-party firm, to assess Servicer's compliance with the Servicing Standards attached as Exhibit A to this Consent Judgment.  The testing shall be conducted in the ordinary course of Servicer's business consistent with industry standards and Servicer's internal testing schedule, which shall be based on an assessment of high risk areas and emerging trends.

10.      *PHH Internal Audit.*  PHH shall ensure that the Internal Audit Department of its parent company conducts audits of Servicer's servicing functions, including Servicer's

compliance with the Servicing Standards.  Servicer shall include the Servicing Standards in its

annual risk assessment, which forms the basis for its annual audit plan, and shall conduct audits

in accordance with its annual risk assessment and annual audit plan.

11.     *Corrective Action Activity*.  In the event any deficiencies are identified through

testing or audits, Servicer shall perform a root cause analysis and determine whether corrective

action activity, including a plan for remediation of any consumer harm, is necessary.

12.     *Executive Committee*.  An executive committee comprised of representatives of

the government signatories to this Consent Judgment and the State Mortgage Regulators'

Consent Order ("Executive Committee") shall serve as the point of contact between Servicer and

the government signatories and shall receive reports and communications from Servicer.

13.     *Reports*.  Servicer shall submit to the State Attorneys General of Executive

Committee on a quarterly basis (1) any PHH Internal Audit reports conducted on Servicer's

compliance with the Servicing Standards during the preceding quarter; (2) any internal or

external transactional testing results and compliance/controls testing results conducted; and (3)

any root-cause analysis or plan for corrective action activity developed or performed by Servicer

during the preceding quarter (collectively, "Reports").  Servicer shall submit Reports on the 20th

day of the month following the end of each quarter, beginning on the 20th day of the month

following the end of the first full quarter of 2018.

14.     *Confidentiality*.  Servicer does not waive any privileges it may otherwise assert by

submitting Reports pursuant to this section.  Specifically, Servicer shall designate as

"CONFIDENTIAL" that portion of any report, supervisory and any supporting information,

document, or portion of a document or other tangible thing provided by Servicer to the State

Attorneys General of Executive Committee, any member thereof, or to any government signatory

6

that Servicer believes contains a trade secret or confidential research, development, or commercial information subject to protection under applicable state or federal laws (collectively, "Confidential Information"). The following provisions shall apply to the treatment of Confidential Information:

      a.      Except as provided by these provisions, all Confidential Information shall be identified as such in a document executed by a representative of Servicer prior to or simultaneous with furnishing of a Report and shall cite the basis for the privilege asserted as to each identified portion.

      b.      The Executive Committee, any member of the Executive Committee, and any government signatory receiving Reports agree to protect Confidential Information to the extent permitted by law, except as needed to support a public enforcement action.

      c.      A government signatory who is not a member of the Executive Committee may request and obtain Reports provided that it (i) agrees to adhere to the provisions herein; and (ii) participates in a meet and confer with the Executive Committee to discuss its request.

      d.      To the extent that the Executive Committee, any Member of the Executive Committee, or any government signatory receives a subpoena or court order or other request for production of Confidential Information, the government signatory shall, unless prohibited under applicable law, notify Servicer of such request and if the government signatory or participating state is required to disclose Confidential Information pursuant to state or federal law, advise Servicer of the disclosure as soon as is practicable to enable Servicer to seek a protective order or stay of production of documents.

e.     The confidentiality provisions of Paragraph 14 are binding on the Parties only to the extent that it does not violate any court order, constitutional provision, or statute prohibiting such confidentiality.

15.     *Auditing Period.*  The auditing and reporting period shall be for three years, commencing on January 1, 2018.

## V.     ENFORCEMENT

16.     Prior to initiating an action to enforce this Consent Judgment, a government signatory shall: (1) provide written notice to the Executive Committee and Servicer of the basis for the potential action and a description of its allegations; (2) allow Servicer 15 days to respond to such notice in writing; and (3) participate in a meet and confer with Servicer if so requested during the 15-day period.

17.     This Consent Judgment shall in no way preclude the State Attorneys General from immediately bringing an action without notice against Servicer if necessary to prevent immediate and irreparable harm and protect the health, safety, and welfare of the public.

18.      This Court retains jurisdiction to enforce the terms of this Consent Judgment. The Parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

19.     This Consent Judgment shall in no way preclude the State Mortgage Regulators from exercising their examination or investigative authority authorized under the laws of the participating states.  Further, nothing in this Consent Judgment shall impede a state regulator's authority to seek the suspension or revocation of a license to protect the general public of that state, or the process or venue used to that end.

## VI.    RELEASE

20.    The Attorneys General and Defendant have agreed, in consideration for the terms provided herein, for the release of certain claims and remedies, as provided in the State Release, attached hereto as Exhibit C.  The Attorneys General and Defendant have also agreed that certain claims and remedies are not released, as provided in Part III of Exhibit C.  The releases contained in Exhibit C shall become effective upon payment of the Settlement Amount by Defendant.

## VII.    OTHER TERMS

21.    Any Attorney General may withdraw from the Consent Judgment and declare it null and void with respect to that party if PHH fails to make any payment required under this Consent Judgment and such non-payment is not cured within thirty days of written notice by the withdrawing Attorney General.

22.    The Effective Date of this Consent Judgment shall be the date on which the Consent Judgment has been entered by the Court and has become final and non-appealable.  An order entering the Consent Judgment shall be deemed final and non-appealable for this purpose if there is no party with a right to appeal the order on the day it is entered.

23.    The Servicing Standards attached as Exhibit A shall remain in full force and effect for three years from the Implementation Date, at which time the Defendant's obligations to comply with the Servicing Standards shall expire.

24.    This Consent Judgment (including the Servicing Standards attached as Exhibit A) is binding on the signatory Attorneys General and PHH Mortgage Corporation.  This Consent Judgment (including the Servicing Standards attached as Exhibit A) does not bind any successors or assigns, future purchasers of all or substantially all of the assets of PHH Corporation or PHH

Mortgage Corporation or successors-in-interest of PHH Corporation or PHH Mortgage

Corporation.  Notwithstanding the foregoing, in the event of the sale of Servicer's servicing or

sub-servicing platform, Servicer will work with the government signatories to ensure an orderly

transition of serviced loans to any new servicer or sub-servicer of such loans.

25.     Nothing in this Consent Judgment shall relieve Defendant of its obligation to

comply with applicable state and federal law.

26.     The sum and substance of the parties' agreement and of this Consent Judgment

are reflected herein and in the Exhibits attached hereto.  In the event of a conflict between the

terms of the Exhibits and Paragraphs 1-26 of this summary document, the terms of the Exhibits

shall govern.

SO ORDERED this _____ day of _____, 2018

_____
UNITED STATES DISTRICT JUDGE

For the State of Alabama:


OLIVIA MARTIN
Assistant Attorney General
Office of the Alabama Attorney General
501 Washington Avenue
Montgomery, AL  36130
Tel.:  334-242-7335
Fax:  334-242-2433

For the State of Alaska:


_Jonathan P. Clement_
JONATHAN P. CLEMENT
Assistant Attorney General
Alaska Attorney General's Office
1031 W. 4th Avenue, Ste. 200
Anchorage, AK  99501
Tel.:   907-269-5200
Fax:    907-276-3697

For the State of Arizona:


MARK BRNOVICH
Arizona Attorney General
by Matthew du Mee
Assistant Attorney General
2005 N. Central Ave.
Phoenix, AZ  85004-1592
Tel.:    602-542-5025
Fax:    602-542-4085

For the State of Arkansas:

LESLIE RUTLEDGE
Attorney General

*Sarah Page Tacker*

SARAH PAGE TACKER
Ark. Bar No. 2002-189
Senior Assistant Attorney General
Office of the Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Tel.: 501-682-5028
Fax: 501-682-8118

For the State of California:

XAVIER BECERRA
Attorney General

TINA CHAROENPONG
Deputy Attorney General
Office of the Attorney General
300 South Spring Street, Ste. 1702
Los Angeles, CA 90013
Tel.:   213-269-6000
Fax:   213-897-4951

15

For the State of Colorado, *ex. rel.*

CYNTHIA COFFMAN, Attorney General:

JENNIFER MINER DETHMERS
THERESA C. LESHER
Assistant Attorneys General
Consumer Protection Section
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Tel.:   720-508-6228
Fax:   720-508-6040

16

For the State of Connecticut:


**Joseph J. Chambers**
Assistant Attorney General
Finance Department Head
Connecticut Office of the Attorney General
P.O. Box 120
55 Elm Street
Hartford, Connecticut 06141-120
Telephone: (860) 808-5270

For the State of Delaware:

MICHAEL VILD
Director, Fraud Division
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE  19801
Tel.:    302-577-8533
Fax:    302-577-8426

For the District of Columbia:

KARL A. RACINE
Attorney General for the District of Columbia

NATALIE LUDAWAY
Chief Deputy

_____

PHILIP ZIPERMAN
Director, Office of Consumer Protection
Office of the Attorney General
441 Fourth Street, N.W., Suite 600-South
Washington, DC  20001
Tel: 202-727-5173
Fax: 202-730-1469

For the State of Florida:

PAMELA JO BONDI
Attorney General


*V. Butler for*

PATRICIA A. CONNERS
Chief Deputy Attorney General
FL Bar No. 361275
Office of the Florida Attorney General
Capitol - Plaza Level - Room PL-01
Tallahassee, FL 32399
Tel:  850-245-0140
Fax: 850-487-2564


*Victoria Butler*

VICTORIA A. BUTLER
Director, Consumer Protection Division
FL Bar No. 861250
Office of the Florida Attorney General
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel:  813-287-7950
Fax: 813-281-5515


ANTHONY S. BRADLOW
Assistant Attorney General
FL Bar No. 104904
Consumer Protection Division
Office of the Florida Attorney General
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel:  813-287-7950
Fax: 813-281-5515

For the State of Georgia:

CHRISTOPHER M. CARR
Attorney General


JEFFREY W. STUMP
Senior Assistant Attorney General
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia 30334
Tel.:     404-656-3337
Fax:      404-656-0677

For the State of Hawaii:

JAMES C. PAIGE
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii 96813
Tel:  808-586-1500
Fax:  808-586-1239

For the State of Idaho:

LAWRENCE WASDEN, Attorney General:

STEPHANIE GUYON
Deputy Attorney General
Office of the Idaho Attorney General
954 W. Jefferson St., 2nd Fl.
P.O. Box 83720
Boise, ID 83720-0010
Tel.:   208-334-2424
Fax:    208-334-4151

For the State of Illinois:

LISA MADIGAN
Attorney General

SUSAN ELLIS
Chief, Consumer Fraud Bureau
ANDREW DOUGHERTY
Assistant Attorney General
Illinois Attorney General's Office
100 W. Randolph, 12th Floor
Chicago, IL 60601
Tel.:   312-814-6351
Fax:   312-814-2593

For the State of Indiana:

**BETSY M. ISENBERG**
Director of the Consumer Protection Division
Office of Indiana Attorney General Curtis Hill
302 West Washington Street
IGCS – 5th Floor
Indianapolis, IN 46204
Tel.:   317-232-6231
Fax:   317-232-7979

For the State of Iowa:

*Patrick Madigan*

PATRICK MADIGAN
Assistant Attorney General
Iowa Attorney General's Office
1305 E. Walnut St.
Des Moines, IA 50319
Tel:  515-281-5926

For the State of Kansas:

_____
KATHRYN CARTER
Assistant Attorney General
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612
Tel.:    785-296-3751
Fax:    785-291-3699

For the Office of the Attorney General of Kentucky:

ANDY BESHEAR
Attorney General


_____

DON RODGERS
Assistant Attorney General
Commonwealth of Kentucky
State Capitol, Suite 118
700 Capital Avenue
Frankfort, Kentucky 40601-3449
Tel.:  502-696-5300
Fax:  502-564-2894

For the State of Louisiana:

JEFF LANDRY
Attorney General

Alberto A. De Puy
Assistant Attorney General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Division
1885 North Third Street
Baton Rouge, Louisiana 70802
Tel.: 225-326-6471
Fax: 225-326-6499

For the State of Maine:

JANET T. MILLS
Attorney General

Brendan O'Neil, Maine Bar # 9900
Assistant Attorney General
Office of the Maine Attorney General
Burton Cross Office Building, 6th Floor
111 Sewall Street
6 State House Station
Augusta, Maine 04330
Tel.:   207-626-8800
Fax:    207-624-7730

For the State of Maryland:

BRIAN E. FROSH
Attorney General

*Lucy A. Cardwell*

LUCY A. CARDWELL
Special Assistant Attorney General
Office of the Attorney General of Maryland
Consumer Protection Division
200 Saint Paul Place, 16th Floor
Baltimore, MD 21202
Tel: 410-576-6337
Fax: 410-576-6566

For the Commonwealth of Massachusetts:

Maura Healey
Attorney General


Michael Lecaroz
Mass. BBO # 672397
Assistant Attorney General
Consumer Protection Division
One Ashburton Place
Boston, MA 02108
Tel: 617-727-2200

For the State of Michigan:


BILL SCHUETTE
Attorney General
D.J. PASCOE
Assistant Attorney General
525 W. Ottawa Street
PO Box 30755
Lansing, MI 48909
Tel.:    517-373-1160
Fax:    517-335-3755

For the State of Minnesota:

LORI SWANSON
Attorney General, State of Minnesota

JASON PLEGGENKUHLE
Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel.:   651-757-1147
Fax:    651-282-5832

For the State of Mississippi:

JIM HOOD, ATTORNEY GENERAL


BRIDGETTE W. WIGGINS
Special Assistant Attorney General
Mississippi Attorney General's Office
Post Office Box 22947
Jackson, MS  39225-2947
Tel.:   601-359-4279
Fax:    601-359-4231

For the State of Missouri:

**JOSHUA D. HAWLEY**
Attorney General

Michael Schwalbert, MO Bar #63229
Assistant Attorney General
815 Olive Street, Suite 200
Saint Louis, Missouri 63101
Phone: 314-340-7888
Fax: 314-340-7957
michael.schwalbert@ago.mo.gov

For the State of Montana:


_Chuck Munson_

TIMOTHY C. FOX
Attorney General
CHUCK MUNSON
Assistant Attorney General
Montana Department of Justice
215 N. Sanders
Helena MT 59624
Tel.:   406-444-2026
Fax:   406-444-3549

For the State of Nebraska:

DOUGLAS J. PETERSON,
Attorney General. #18146


MEGHAN E. STOPPEL, #26290
Assistant Attorney General
Office of the Attorney General
2115 State Capitol
Lincoln, NE 68509-8920
Tel.:    402-471-2811
Fax:    402-471-4725

For the State of Nevada:

ADAM PAUL LAXALT
Attorney General


SHERI ANN FORBES
Senior Deputy Attorney General
Nevada Bar No. 7337
10791 W. Twain Avenue, Ste. 100
Las Vegas, Nevada 89135
Tel:  702-486-3085
Fax:  702-486-3283

For the State of New Jersey:

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY

LORRAINE K. RAK
Deputy Attorney General
Chief, Consumer Fraud Prosecution Section
Division of Law
124 Halsey Street – 5th Floor
P.O. Box 45029
Newark, New Jersey 07101
Tel.:   973-877-1280
Fax:   973-648-4887

For the State of New Mexico:
HECTOR H. BALDERAS, Attorney General


SCOTT CAMERON
Assistant Attorney General
Office of the New Mexico Attorney General
Consumer Protection Division
201 Third St NW, Suite 300
Albuquerque, NM 87102
Tel: 505-717-3511
Fax: 505-318-1051

For the State of New York:

ERIC T. SCHNEIDERMAN
Attorney General


_____
JANE M. AZIA
Bureau Chief
Bureau of Consumer Frauds & Protection
Office of the New York State Attorney General
120 Broadway
New York, NY 10271
Tel.:   212-416-8727
Fax:   212-416-6003

For the Attorney General of North Carolina:

JOSH STEIN
Attorney General

KEITH T. CLAYTON
Special Deputy Attorney General
N.C. Department of Justice
P. O. Box 629
Raleigh, NC 27602
Tel.:   919-716-6000
Fax:    919-716-6019

For the State of North Dakota

WAYNE STENEHJEM
Attorney General

PARRELL D. GROSSMAN
(ID No. 04684)
Assistant Attorney General
Director, Consumer Protection and Antitrust
Division
Office of Attorney General
Gateway Professional Center
1050 E Interstate Ave, Ste. 200
Bismarck, ND  58503-5574
Tel:  701-328-5570
Fax: 701-328-5568

For the State of Ohio:

MIKE DEWINE
Ohio Attorney General


JEFFREY R. LOESER (Ohio Bar #0082144)
Senior Assistant Attorney General
Consumer Protection Section
30 E. Broad St., 14th Floor
Columbus, OH 43215
Tel.:   614-644-9618
Fax:    877-650-4712

For the State of Oklahoma:

MIKE HUNTER
ATTORNEY GENERAL FOR THE
STATE OF OKLAHOMA


Malisa McPherson, OBA #32070
Assistant Attorney General
Deputy Chief, Consumer Protection Unit
313 N.E. 21st Street
Oklahoma City, Oklahoma 73105
Telephone:  (405) 521-3921
Fax:  (405) 522-0085
Email:  *Malisa.McPherson@oag.ok.gov*

For the State of Oregon,

Attorney General
ELLEN ROSENBLUM:


D. ALTHEA CULLEN
Assistant Attorney General
Oregon Department of Justice
Financial Fraud/Consumer Protection
100 SW Market St
Portland, OR 97201
Tel.:   971-673-1880
Fax:    971-673-1888

For the Commonwealth of Pennsylvania

JOSH SHAPIRO
Attorney General


JOHN M. ABEL
Senior Deputy Attorney General
Commonwealth of Pennsylvania
Office of Attorney General
Bureau of Consumer Protection
15th Floor, Strawberry Square
Harrisburg, PA 17120
Tel:    717-787-1439
Fax:    717-705-3795

For the Rhode Island Department of Attorney General:

GERALD COYNE
Rhode Island Department of Attorney General
Deputy Attorney General
150 South Main Street
Providence, RI 02903
Tel:   401-274- 4400 Ext. 2257
Fax:   401- 222-1302

For the State of South Carolina:


ALAN WILSON
Attorney General
W. JEFFREY YOUNG
Chief Deputy Attorney General
C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
JARED Q. LIBET
Assistant Deputy Attorney General
South Carolina Attorney General's Office
1000 Assembly Street
Columbia, SC 29201
Tel.:      803-734-3970
Fax:      803-734-3677

For the State of South Dakota:

PHILIP D. CARLSON
Assistant Attorney General
South Dakota Attorney General's
Office
1302 E. Highway 14, Suite 1
Pierre, SD 57501
Tel.: 605-773-3215
Fax: 605-773-4106

For the State of Tennessee:

HERBERT H. SLATERY III, B.P.R. No. 9077
Attorney General and Reporter


TRAVIS BROWN, B.P.R. No. 34164
Assistant Attorney General
Consumer Protection and Advocate Division
Public Protection Section
Office of the Tennessee Attorney General
300 Deaderick Street, 20th Floor
Nashville, TN 37243
Tel.:   615-741-3533
Fax:   615-532-2910
travis.brown@ag.tn.gov

For the State of Texas:

RICHARD L. BISCHOFF
Assistant Attorney General
Consumer Protection Division
401 E. Franklin Avenue, Suite 530
El Paso, Texas 79901
Tel.:  915- 834-5800
Fax:  915-542-1546

For the State of Utah:

_____

SEAN D. REYES
Utah Attorney General,
including as counsel for the Utah Division of Consumer Protection
350 North State Street, #230
Salt Lake City, UT 84114-2320
Tel.:  801-538-1191
Fax:  801-538-1121

For the State of Vermont:

THOMAS J. DONOVAN, JR.
Attorney General

JAMES LAYMAN
Assistant Attorney General
109 State Street
Montpelier, VT 05609-1001
(802) 828-2315

For The Commonwealth of Virginia,

*ex rel.* MARK HERRING,
Attorney General:

DAVID B. IRVIN (VSB #23927)
Senior Assistant Attorney General
JAMES E. SCOTT (VSB #88882)
Assistant Attorney General
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219
Tel.:      804-225-4778
Fax:      804-786-0122

For the State of Washington:

ROBERT FERGUSON
Attorney General


AMY TENG WSBA #50003
Assistant Attorney General
Consumer Protection Division
Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Tel: 206-464-7745
Fax: 206-587-5636

STATE OF WEST VIRGINIA
PATRICK MORRISEY
ATTORNEY GENERAL


R. STEPHEN JARRELL
Assistant Attorney general
Office of the Attorney General of West Virginia
812 Quarrier Street, 1st Floor
P.O. Box 1789
Charleston, WV  25326
Tel.:   304-558-8986
Fax:   304-558-0184

For the State of Wisconsin:

BRAD SCHIMEL
Attorney General

GWENDOLYN J. COOLEY
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel:   608-261-5810
Fax:   608-267-2778

For the State of Wyoming:

PETER K. MICHAEL
Wyoming Attorney General
Benjamin M. Burningham (Wyo. Bar. No. #7-5616)
Assistant Attorney General
Kendrick Building
2320 Capitol Avenue
Cheyenne, WY 82002
Tel.: 307-777-7847
Fax: 307-777-3435

For PHH Mortgage Corporation:

Robert B. Crowl
President and Chief Executive Officer

# EXHIBIT A

# Servicing Standards

The provisions outlined below are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower unless otherwise noted herein.

I.  **FORECLOSURE AND BANKRUPTCY INFORMATION AND DOCUMENTATION.**

Unless otherwise specified, these provisions shall apply to bankruptcy and foreclosures in all jurisdictions regardless of whether the jurisdiction has a judicial, non-judicial, or quasi-judicial process for foreclosures and regardless of whether a statement is submitted during the foreclosure or bankruptcy process in the form of an affidavit, sworn statement, or declaration[s] under penalty of perjury (to the extent stated to be based on personal knowledge) ("Declaration").

A.  Standards for Documents Used in Foreclosure and Bankruptcy Proceedings.

1.  Servicer shall ensure that factual assertions made in pleadings (complaint, counterclaim, cross-claim, answer, or similar pleadings), bankruptcy proofs of claim (including any facts provided by Servicer or based on information provided by Servicer that are included in any attachment and submitted to establish the truth of such facts) ("POC"), Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale, and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence. Before a loan is referred to non-judicial foreclosure, Servicer shall ensure that such evidence (including all documents and records pertaining to the borrower's loan status and loan information) has been reviewed to substantiate the borrower's default and the right to foreclose. Servicer shall retain a copy of any and all documents and records which substantiate the initiation of a foreclosure action, including copies of all documents related to non-judicial foreclosure actions.

2.  Servicer shall ensure that affidavits, sworn statements, and Declarations are based on personal knowledge, which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

3.  Servicer shall ensure that affidavits, sworn statements, and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in affidavit, sworn statement, or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan status and required loan ownership information. If an affiant relies on a review of business records for the basis of its affidavit, the referenced business record shall be attached if required by applicable state or federal law or court rule. This provision does not apply to affidavits, sworn statements, and Declarations signed by counsel based

solely on counsel's personal knowledge (such as affidavits of counsel relating to service of process, extensions of time, or fee petitions) that are not based on a review of Servicer's books and records. Separate affidavits, sworn statements, or Declarations shall be used when one affiant does not have requisite personal knowledge of all required information.

4.    Servicer shall have adequate standards for qualifications, training, and supervision of employees. Servicer shall train and supervise employees who regularly prepare or execute affidavits, sworn statements, or Declarations. Each such employee shall sign a certification that he or she has received the training. Servicer shall oversee the training completion to ensure each required employee properly and timely completes such training. Servicer shall maintain written records confirming that each such employee has completed the training and the subjects covered by the training.

5.    Effective April 1, 2018 and as it relates solely to foreclosure proceedings, Servicer shall review and approve standardized forms of affidavits, standardized forms of sworn statements, and standardized forms of Declarations prepared by or signed by an employee or officer of Servicer, or executed by a third party using a power of attorney on behalf of Servicer, to ensure compliance with applicable law, rules, court procedure, and the terms of this Agreement ("this Agreement").

6.    As it relates solely to foreclosure proceedings, affidavits, sworn statements, and Declarations shall accurately identify the name of the declarant/affiant ("affiant"), the entity of which the affiant is an employee, the affiant's title, and the affiant's duties or responsibilities. Affiants shall date their signatures on affidavits, sworn statements, or Declarations.

7.    Servicer shall assess and ensure that it has an adequate number of employees and that employees have reasonable time to prepare, verify, and execute pleadings, POCs, motions for relief from stay ("MRS"), affidavits, sworn statements, and Declarations.

8.    Servicer shall not pay volume-based or other incentives to employees or third-party providers or trustees that encourage undue haste or lack of due diligence over quality.

9.    Affiants shall be individuals, not entities, and affidavits, sworn statements, and Declarations shall be signed by the affiant.

10.   Servicer shall maintain records in accordance with applicable state record retention requirements and state notary laws that identify all notarizations of Servicer documents executed by each notary employed by Servicer.

11.   Servicer shall not file a POC in a bankruptcy proceeding which, when filed, contained materially inaccurate information. In cases in which such a POC may have been filed, Servicer shall not rely on such POC and shall (a) in active cases, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such POC with an amended POC as promptly as reasonably practicable (and, in any event, not

more than 45 days after acquiring actual knowledge of such material inaccuracy and provide appropriate written notice to the borrower or borrower's counsel; and (b) in other cases, at Servicer's expense, take appropriate action after acquiring actual knowledge of such material inaccuracy.

12.     Servicer shall not rely on an affidavit of indebtedness or similar affidavit, sworn statement, or Declaration filed in a pending pre-judgment judicial foreclosure or bankruptcy proceeding which (a) was required to be based on the affiant's review and personal knowledge of its accuracy but was not, (b) was not, when so required, properly notarized, or (c) contained materially inaccurate information in order to obtain a judgment of foreclosure, order of sale, relief from the automatic stay, or other relief in bankruptcy. In pending cases in which such affidavits, sworn statements, or Declarations may have been filed, Servicer shall, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such affidavits with new affidavits and provide appropriate written notice to the borrower or borrower's counsel. In pending post-judgment, pre-sale cases in judicial foreclosure proceedings in which an affidavit or sworn statement was filed which was required to be based on the affiant's review and personal knowledge of its accuracy but may not have been, or that may not have, when so required, been properly notarized, and such affidavit or sworn statement has not been re-filed, Servicer, unless prohibited by state or local law or court rule, will provide written notice to borrower at borrower's address of record or borrower's counsel prior to proceeding with a foreclosure sale or eviction proceeding.

13.     Prior to making the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process, Servicer shall validate the note or, if necessary, create a lost note affidavit, and Servicer shall conduct a legal entity review, which will include a chain of title review as well as verification of the identity of the investor. Within five days after referral to foreclosure, Servicer shall send borrowers a letter containing the information required in paragraphs I.B.7, IV.D.5, and IX.A.2 of this Agreement. In addition, delinquent borrowers currently receiving regular periodic statements will receive periodic statements as indicated in paragraph I.B.12. For delinquent borrowers who are delinquent by more than 45 days currently using a coupon book, a delinquency notice compliant with applicable law will be provided.

B.     Requirements for Accuracy and Verification of Borrower's Account Information.

1.     Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation of borrower account information, which may be in either electronic or paper format.

2.     Unless a contrary payment application is required by the mortgage, note, or

court order, Servicer must apply payments in accordance with the borrower's instructions. Servicer's payment coupons and online payment submission screen must include a payment instruction line for any payment or payment portion that exceeds the current amount due. Servicer must engage in good faith efforts to resolve disputes brought to Servicer's attention concerning the borrower's instructions.

3.      Servicer shall credit a periodic payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency. However, if Servicer specifies in writing requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, Servicer shall credit the payment as of five days after receipt. A periodic payment, as used in this paragraph, is an amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle. A payment qualifies as a periodic payment even if it does not include amounts required to cover late fees, other fees, or non-escrow payments a servicer has advanced on a consumer's behalf.

4.      For any loan on which interest is calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, as well as non-conforming payments, unless such application conflicts with contract provisions or prevailing law. Servicer shall ensure that properly identified payments shall be posted no more than five business days after receipt at the address specified by Servicer and credited as of the date received to borrower's account (unless applicable law requires a shorter period for posting).

5.      For any loan on which interest is not calculated based on a daily accrual or daily interest method and as to which any obligor is not a debtor in a bankruptcy proceeding without reaffirmation, Servicer shall promptly accept and apply all borrower conforming payments, including cure payments (where authorized by law or contract), unless such application conflicts with contract provisions or prevailing law. Servicer shall continue to accept trial modification payments consistent with existing payment application practices. Servicer shall ensure that properly identified payments shall be posted no more than five business days after receipt at the address specified by Servicer (unless applicable law requires a shorter period for posting).

   a.      Servicer shall accept and apply at least two non-conforming payments from the borrower, in accordance with this subparagraph, when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled payment, including principal and interest and, where applicable, taxes and insurance.

A-4

b.    Except for payments described in paragraph I.B.5.a, Servicer may post partial payments to a suspense or unapplied funds account, provided that Servicer (1) for borrowers who receive periodic statements discloses to the borrower the existence of a suspense or unapplied funds account and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments as required by the terms of the loan documents. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current or other final disposition of the loan.

6.    Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

7.    In the statements described in paragraph I.A.13, Servicer shall notify borrowers that they may receive, upon written request:

a.    A copy of the borrower's payment history since the borrower was last less than 60 days past due;

b.    A copy of the borrower's note;

c.    If Servicer has commenced foreclosure or filed a POC, copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law; and

d.    The name of the investor that holds the borrower's loan.

8.    As described in paragraph I.B.7, above, Servicer shall respond to a borrower's written request in writing, no later than 30 days after receipt of a borrower's written request.

9.    Servicer shall adopt enhanced billing dispute procedures, including for disputes regarding fees. These procedures will include:

a.    Establishing readily available methods for customers to lodge complaints and pose questions, such as by providing toll-free telephone numbers and accepting disputes via electronic means (if available);

b.    Assessing and ensuring adequate and competent staff to answer and respond to consumer disputes promptly;

c.    Establishing a process for dispute escalation;

d.    Tracking the resolution of complaints; and

e.      Providing a toll-free telephone number on monthly billing statements.

f.      Servicer shall comply with all other requirements of Section VIII of this Agreement in responding to billing disputes.

10.    Servicer shall take appropriate action to promptly remediate any inaccuracies in borrowers' account information, including:

a.      Correcting the account information;

b.      Providing refunds directly to borrower or account credits;

c.      Correcting inaccurate reports to consumer credit reporting agencies;

d.      Communicating whatever corrective action was taken to the borrower and any authorized third party working on behalf of the borrower; and

e.      Documenting within the system of record whatever corrective action was taken and communicated to the borrower or the borrower's representative.

11.    Servicer's system of record shall be periodically independently reviewed for accuracy and completeness by an external auditor or Servicer's internal audit department.

12.    As indicated in paragraph I.A.13, Servicer shall send the borrower a periodic statement or, as applicable, a delinquency notice setting forth each of the following items, to the extent applicable:

a.      The total amount needed to reinstate or bring the account current, and the amount of the principal obligation under the mortgage;

b.      The date through which the borrower's obligation is paid;

c.      The date of the last full payment;

d.      The current interest rate in effect for the loan (if the rate is effective for at least 30 days);

e.      The date on which the interest rate may next reset or adjust (unless the rate changes more frequently than once every 30 days);

f.      The amount of any prepayment fee to be charged, if any;

g.      A description of any late payment fees;

h.      A telephone number and electronic mail address that may be used by the obligor to obtain information regarding the mortgage; and

i.      The Web site to access either the Consumer Financial Protection Bureau list or the HUD list of homeownership counselors and counseling organizations and the HUD toll-free telephone number to access contact information for homeownership counselors or counseling organizations.

13.    In active chapter 13 cases, Servicer shall ensure that:

    a.    Prompt and proper application of payments is made on account of (a) pre-petition arrearage amounts and (b) post-petition payment amounts and posting thereof as of the successful consummation of the effective confirmed plan;

    b.    The debtor is treated as being current so long as the debtor is making payments in accordance with the terms of the then-effective confirmed plan and any later effective payment change notices; and

    c.    As of the date of dismissal of a debtor's bankruptcy case, entry of an order granting Servicer relief from the stay, or entry of an order granting the debtor a discharge, there is a reconciliation of payments received with respect to the debtor's obligations during the case and appropriately update Servicer's systems of record. In connection with such reconciliation, Servicer shall reflect the waiver of any fee, expense or charge pursuant to paragraphs III.B.1.c.i or III.B.1.d.

C.    Documentation of Note, Holder Status and Chain of Assignment.

    1.    If the original note is lost or otherwise unavailable, Servicer shall comply with applicable law in an attempt to establish ownership of the note and the right to enforcement. Servicer shall ensure good faith efforts to obtain or locate a note lost while in the possession of Servicer or Servicer's agent and shall ensure that Servicer and Servicer's agents who are expected to have possession of notes or assignments of mortgage on behalf of Servicer adopt procedures that are designed to provide assurance that Servicer or Servicer's agent would locate a note or assignment of mortgage if it is in the possession or control of Servicer or Servicer's agent, as the case may be. In the event that Servicer prepares or causes to be prepared a lost note or lost assignment affidavit with respect to an original note or assignment lost while in Servicer's control, Servicer shall use good faith efforts to obtain or locate the note or assignment in accordance with its procedures. In the affidavit, sworn statement or other filing documenting the lost note or assignment, Servicer shall recite that Servicer has made a good faith effort in accordance with its procedures for locating the lost note or assignment.

    2.    Servicer shall not intentionally destroy or dispose of original notes that are still in force.

D.    Bankruptcy Documents.

    1.    **Proofs of Claim ("POC")**. Servicer shall ensure that POCs filed on behalf of Servicer are documented in accordance with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local rule or order ("Bankruptcy Law"). Unless not permitted by statute or rule, Servicer shall ensure that each POC is documented by attaching:

    a.    The original or a duplicate of the note, including all indorsements; a copy of any mortgage or deed of trust securing the notes (including,

if applicable, evidence of recordation in the applicable land records); and copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law (collectively, "Loan Documents"). If the note has been lost or destroyed, a lost note affidavit shall be submitted.

b.    If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim (including any expenses or charges based on an escrow analysis as of the date of filing) at least in the detail specified in Official Forms B 410 and B 410-A (April 1, 2016or as amended).

c.    A statement of the amount necessary to cure any default as of the date of the petition shall be filed with the proof of claim.

d.    If a security interest is claimed in property that is the debtor's principal residence, the attachment prescribed by the appropriate Official Form (Official Form B 410-A effective December 1, 2015or as amended) shall be filed with the proof of claim.

e.    Servicer shall include a statement in a POC (or in an attachment filed with the POC) setting forth the basis for asserting that the applicable party has the right to foreclose.

f.    The POC shall be signed (either by hand or by appropriate electronic signature) by the person responsible for reviewing the debtor's account and billing record, which may include the Servicer or the Servicer's bankruptcy attorney, under penalty of perjury after reasonable investigation, stating that the information set forth in the POC is true and correct to the best of such responsible person's knowledge, information, and reasonable belief, and it shall clearly identify the person's employer, the person's position or title with the employer, and the person's responsibilities and duties for the employer.

2.    **Motions for Relief from Stay ("MRS")**. Effective April 1, 2018, unless not permitted by a specific jurisdiction, court, or Bankruptcy Law, and to the extent not previously filed with the court, Servicer shall ensure that each MRS in a chapter 13 proceeding is documented by attaching to, or including in the motion:

a.    A copy of the loan documents. If the promissory note has been lost or destroyed, a lost note affidavit shall be submitted.

b.    A statement setting forth the basis for asserting that the applicable party has the right to foreclose.

c.    An affidavit, sworn statement, or Declaration made by Servicer or based on information provided by Servicer ("MRS affidavit" which

term includes, without limitation, any facts provided by Servicer that are included in any attachment and submitted to establish the truth of such facts) setting forth:

i. Whether there has been a default in paying pre-petition arrearage or post-petition amounts (an "MRS delinquency");

ii. If there has been such a default, (a) the unpaid principal balance, (b) a description of any default with respect to the pre-petition arrearage, (c) a description of any default with respect to the post-petition amount (including, if applicable, any escrow shortage), (d) the amount of the pre-petition arrearage (if applicable), (e) the post-petition payment amount, (f) for the period since the date of the first post-petition or pre-petition default that is continuing and has not been cured, the date and amount of each payment made (including escrow payments) and the application of each such payment, and (g) the amount, date, and description of each fee or charge applied to such pre-petition amount or post-petition amount since the later of the date of the petition or the preceding statement pursuant to paragraph III.B.1.a; and

iii. All amounts claimed, including a statement of the amount necessary to cure any default on or about the date of the MRS.

d. All other attachments prescribed by statute, rule, or law.

e. Servicer shall ensure that any MRS discloses the terms of any trial period or permanent loan modification plan pending at the time of filing of a MRS or whether the debtor is being evaluated for a loss mitigation option.

E. Quality Assurance Systems Review.

Servicer shall conduct regular pre-filing reviews of a statistically valid sample of POCs, MRS, and mortgage creditor specific notices and filings required under Federal Rule of Bankruptcy Procedure 3002.1 (e.g., notices of payment changes, notices of post-petition fees, expenses, and charges, and responses to notices of final cure) (collectively "Bankruptcy Filings") to ensure that the Bankruptcy Filings are accurate and comply with prevailing law and this Agreement. The reviews shall also verify the accuracy of the statements in Bankruptcy Filings. Servicer shall take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases. The pre-filing review shall be conducted by Servicer employees who are separate and independent of the persons who prepared the Bankruptcy Filings.

## II.   THIRD-PARTY PROVIDER OVERSIGHT.

A.   Oversight Duties Applicable to Third-Party Providers.

Servicer shall adopt policies and processes to oversee and manage third party providers, such as foreclosure firms, law firms, foreclosure trustees, subservicers, and other agents, independent contractors and entities retained by Servicer that provide foreclosure, bankruptcy, or mortgage servicing activities (including, but not limited to, loss mitigation, property preservation, homeowner's insurance, and real-estate owned services) (collectively, such activities are "Servicing Activities" and such providers are "Third-Party Providers"), including:

1.   Servicer shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability.

2.   Servicer shall ensure that it complies with all aspects of this Agreement and applicable state and federal laws or regulations, including, but not limited to, Servicing Activities performed by Third-Party Providers.

3.   Servicer shall ensure that agreements, contracts, or oversight policies provide for adequate oversight, including measures to enforce Third-Party Provider contractual obligations, and to ensure timely action with respect to Third-Party Provider performance failures. Servicer will ensure that all loan level information for activities performed by consumer-facing Third Party Providers will be available to state mortgage regulators for review. Books and records of Third-Party Providers who provide consumer-facing Servicing Activities will be made available to the state mortgage regulators to the extent required by applicable state and federal law.

4.   Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have appropriate access to information from Servicer's books and records necessary to perform their duties in preparing pleadings and other documents submitted in foreclosure and bankruptcy proceedings.

5.   Servicer shall ensure that all information provided by or on behalf of Servicer to Third-Party Providers in connection with providing Servicing Activities is accurate and complete.

6.   Servicer shall conduct periodic reviews of Third-Party Providers. These reviews shall include:

a.   A review of a sample of the foreclosure and bankruptcy documents prepared by the Third-Party Provider, to provide for compliance with applicable state and federal law and this Agreement in connection with the preparation of the documents, and the accuracy of the facts contained therein;

b.   A review of the fees and costs assessed by the Third-Party Provider to provide that only fees and costs that are lawful, reasonable, and actually incurred are charged to borrowers and that no portion of any

fees or charges incurred by any Third-Party Provider for technology usage, connectivity, or electronic invoice submission is charged as a cost to the borrower;

c. A review of the Third-Party Provider's processes to provide for compliance with the applicable servicing standards contained in this Agreement;

d. A review of the security of original loan documents maintained by the Third-Party Provider;

e. A requirement that the Third-Party Provider disclose to Servicer any imposition of sanctions or professional disciplinary action taken against them for misconduct related to performance of Servicing Activities;

f. An assessment of whether bankruptcy attorneys comply with the best practice of determining whether a borrower has made a payment curing any MRS delinquency within two business days of the scheduled hearing date of the related MRS;

g. A review of consumer complaints received by attorneys retained by Servicer for foreclosure, bankruptcy, and eviction services  relating to Servicer or Servicing Activities taken by such counsel on behalf of Servicer (or if not directly related to Servicer, notice to Servicer by counsel of information that has an  overall impact to counsel's operations that impact Servicer) and a review of consumer complaints received by borrower-facing Third-Party Providers relating to Servicer or Servicing Activities taken by such borrower-facing Third-Party Providers and, in each case, their response to those complaints; and

h. A review of all regulatory investigations and regulatory actions relating to the Third-Party Provider's performance of Servicing Activities or servicing standards contained in this Agreement unless applicable law forbids the Third-Party Provider from sharing such information.

i. As part of its periodic review of its Third-Party Providers, Servicer shall also review and evaluate such Third-Party Providers' policies and procedures regarding the identification and investigation into root causes of any deficiencies or issues relating to its performance of Servicing Activities, the remediation of any deficiencies or issues, and the disclosure of such information to Servicer. Servicer shall evaluate the sufficiency of any investigation that is disclosed to Servicer and remedial actions taken by such Third-Party Providers as it relates to the Servicing Activities and ensure that all deficiencies or issues are adequately addressed and corrected.

7. The periodic written review set forth in paragraph II.A.6, above, shall be conducted by employees independent of the Servicing Activities conducted

by Servicer or by an external independent reviewer. The findings, methodology, and conclusions of the periodic review shall be memorialized in a written report that Servicer must maintain in accordance with paragraph X.A.3 of this Agreement. Servicer must make these reports available to the Executive Committee upon request. The periodic review and written report must occur at least every 18 months for foreclosure, bankruptcy, and eviction counsel, unless a shorter period is required by the Executive Committee or Servicer discovers a material violation of this Agreement and reasonably determines that more frequent reviews are necessary to remediate violations and ensure future compliance. The periodic review and written report must occur at least every 24-36 months for property preservation companies, unless a shorter period is required by the Executive Committee or Servicer discovers a material violation of this Agreement and reasonably determines that more frequent reviews are necessary to remediate violations and ensure future compliance. For all other Third-Party Providers, Servicer shall conduct a review and written report within a shorter period than is required by its established review governance and third-party risk ranking framework if required by the Executive Committee or Servicer discovers a material violation of this Agreement and reasonably determines that more frequent reviews are necessary to remediate violations and ensure future compliance. Servicer shall take appropriate remedial steps if problems are identified through this review or otherwise, including, when appropriate, terminating its relationship with the Third-Party Provider.

8.    Servicer shall adopt processes for reviewing and appropriately addressing consumer complaints it receives about Third-Party Provider Servicing Activities.

9.    Servicer shall require its Third-Party Providers to provide Servicer with notification of a consumer complaint received by the Third-Party Provider within five days of receiving the complaint. Servicer shall have access to all of the underlying documents surrounding consumer complaints received by the Third-Party Provider related to Servicing Activities.

10.   To the extent that Servicer relies on Third-Party Providers, or the vendors of Third-Party Providers, to perform any of the Servicing Activities, Servicer acknowledges that Servicer is liable for any noncompliance by any such Third-Party Providers or vendors of Third-Party Providers with the Servicing Activities.

B.    Restrictions and Oversight Duties Related to Affiliated Third-Party Providers.

Servicer shall not enter into a contractual relationship for Servicing Activities with a Third-Party Provider unless it is the result of an arm's-length transaction among unrelated entities or any fee charged to a borrower does not exceed the lesser of (a) any fee limitation or allowable amount for the service under applicable state law, or (b) the market rate for the service. To determine the market rate, Servicer shall obtain annual market reviews of its affiliated Third-Party Provider's pricing for such services. Such market reviews shall be performed by a qualified, objective, independent third-party

professional using procedures and standards generally accepted in the industry to yield accurate and reliable results and shall be provided to the Executive Committee by request. The independent third-party professional shall determine in its market survey the price actually charged by affiliated Third-Party Providers and by independent third-party providers. Arm's-length transaction means a transaction in which both parties are acting independently and in their own self-interest.

C.   Additional Oversight of Activities by Attorneys and Law Firms Retained by Servicer for Foreclosure, Bankruptcy, and Eviction Services.

    1.   Servicer shall require a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for Servicer, on a periodic basis, as qualified to serve as a Third-Party Provider to Servicer, including that attorneys have the experience and competence necessary to perform the services requested.

    2.   Servicer shall ensure that attorneys are licensed to practice in the relevant jurisdiction, have the experience and competence necessary to perform the services requested, and that their services comply with applicable rules, regulations and applicable law (including state law prohibitions on fee splitting).

    3.   Servicer shall ensure that foreclosure and bankruptcy counsel and foreclosure trustees have an appropriate Servicer contact to assist in legal proceedings and to facilitate loss mitigation questions on behalf of the borrower.

    4.   Servicer shall adopt policies requiring attorneys retained by Servicer for foreclosure, bankruptcy, and eviction services, and foreclosure trustees to maintain records that identify all notarizations of Servicer documents executed by each notary employed by the foreclosure, bankruptcy and eviction counsel or foreclosure trustees.

D.   Additional Property Preservation Oversight and Obligations.

    1.   In addition to the oversight obligations described in this Section (II), Servicer shall also comply with the additional oversight and obligations specific to property preservation contained in this paragraph (II.D). To the extent that Servicer relies on Third-Party Providers, or the vendors of Third Party Providers, to perform any of the functions or services described in the provisions in paragraph II.D, Servicer acknowledges that Servicer is liable for any noncompliance by any such Third-Party Providers or vendors of Third Party Providers with these provisions.

    2.   Servicer shall only inspect or secure a property when authorized to do so by the loan documents, investor guidelines, or law, unless expressly prohibited by law.

    3.   Servicer shall not remove personal property, or cause or allow the removal of personal property, unless the removal of personal property from the property is authorized by a court order or otherwise authorized by

applicable law, except that Servicer may remove personal property as necessary to address a health or infestation risk, such as rotting food.

4.   Prior to ordering the securing of vacant or abandoned property, Servicer must review its system of record for recent consumer communication that is inconsistent with vacancy or abandonment, and Servicer shall not order a secure in such instances unless subsequent attempts to establish contact with the borrower fail or Servicer obtains information causing Servicer to reasonably believe the property has been vacant or abandoned. Servicer must document its attempts to contact the borrower and any information causing Servicer to reasonably believe the property has been vacant or abandoned. If there is borrower communication within the past 30 days or other evidence in the system of record that is inconsistent with a determination of vacancy or abandonment, then Servicer must promptly notify the inspector of such findings and direct the inspector that no further property preservation activity shall occur at the property until Servicer has determined that the property is vacant or abandoned based on Servicer's additional outreach efforts to communicate with the borrower, or otherwise has an understanding of the facts that would resolve the conflict in the record and would reasonably support a determination of vacancy or abandonment.

5.   For pre-REO properties, Servicer must comply with the following obligations:

a.   Servicer shall only secure property that it reasonably believes has been vacant or abandoned or is in unsecure condition based on at least two external inspections of the property, and Servicer may only enter and secure the property if the second inspection confirms that the factors demonstrating the property is vacant or has been abandoned persist. Servicer must wait at least three days between inspections (unless there is an emergency requiring immediate action to protect the property and waiting three days is reasonably likely to result in substantial harm to the property), and must post the notices required below after each inspection.

b.   When Servicer determines that a property is vacant or abandoned, Servicer must, unless otherwise prohibited by applicable local law, affix a notice on the front door of the property (1) advising the occupant that Servicer has determined that the property has been abandoned, (2) stating the date of the inspection(s), (3) advising the occupant to call the inspector if that determination is incorrect and providing a 24-hour toll-free telephone number that the occupant may call, and (4) advising that Servicer may secure the property in three days unless the occupant contacts Servicer, or if notice follows the second inspection, advise the occupant that the property has been secured and that the occupant should call the 24-hour telephone number if the occupant is still residing in the property or has personal property in the property. This notice must include a

statement in Spanish directing the occupant to call the inspector's 24-hour toll-free telephone number to report that the property is not abandoned or for more information.

c.      A determination that the property is vacant or has been abandoned must be based on the good faith judgment of the inspectors, supported by objective factors which are documented by each inspector with date and time-stamped photographs, and a declaration of each inspector attesting to the factors giving rise to the determination. A drive-by inspection where the inspector does not exit his or her vehicle shall not constitute good faith, except in circumstances requiring no physical contact for personal safety reasons that are documented in Servicer's system of record.

d.      Servicer shall not consider a property vacant or abandoned if:

    i.      The occupant or mortgagor tells Servicer that the property is occupied or is being regularly maintained; provided that an occupant's or mortgagor's prior assertion that a property is being maintained will not prevent a property from being deemed abandoned if, after such assertion is made, Servicer observes factors consistent with vacancy or abandonment, and Servicer follows the procedures set forth in this Agreement; or

    ii.     The occupant or mortgagor is in active loss mitigation communication that is inconsistent with vacancy or abandonment.

e.      Servicer shall ensure that calls made to the 24-hour toll-free telephone number are recorded (unless prohibited by law) and retained for a period of at least five years, along with any notes or other documentation relating to those calls.

f.      Servicer shall inform inspectors of any recent communication from an occupant of the property that may be inconsistent with vacancy or abandonment.

g.      If Servicer secures a vacant or abandoned property, Servicer must promptly comply with any applicable law requiring registration of vacant or abandoned property.

h.      Servicer shall not winterize a property unless winterizing is reasonably necessary at the time of the secure to protect the property or is required by GSE or FHA guidelines.

i.      If an occupant notifies Servicer that the occupant has been locked out of the property, Servicer must make reasonable efforts to restore the occupant to exclusive access to the property within 24 hours. Servicer shall document in its system of record the reasonable

efforts undertaken to restore the occupant with exclusive access to the property. Notwithstanding this provision, Servicer shall have no obligation to comply with this paragraph (II.D.5.i) if Servicer confirms that the occupant does not want exclusive access to the property.

j.   If an occupant notifies Servicer of a utility shut-off that was caused by Servicer, Servicer must make reasonable efforts to cause utility service to be restored within 24 hours. Servicer shall document in its system of record the reasonable efforts undertaken to restore the occupant's utility services within 24 hours.

k.   If Servicer has removed personal property and an occupant subsequently requests the return of the personal property, Servicer shall return the personal property within three days. If Servicer no longer has the personal property, Servicer shall reimburse the occupant for the reasonable replacement value of the personal property within 14 days. Servicer shall not require the occupant to provide photographs or receipts for the missing personal property, though Servicer may request that the occupant provide a list itemizing and valuing the missing property, along with an affidavit. Nothing in this paragraph shall obligate Servicer to reimburse the occupant if Servicer was authorized to remove the personal property by a court order or other applicable law, or if Servicer removed the personal property because it was necessary to address a health or infestation risk that Servicer has documented with photographs.

l.   Servicer shall not incentivize inspectors to deem a property vacant or abandoned when, in fact, the property is occupied. Nor shall Servicer incentivize or prioritize speed over accuracy in making vacancy or abandonment determinations or securing property.

m.   Servicer shall not penalize or disincentivize inspectors from determining that a property is not vacant or abandoned. Determining that a property is not vacant or abandoned shall be given the same score or weight as determining that a property is vacant or abandoned for the purpose of evaluating performance and assigning priority for future work orders.

n.   Servicer shall ensure that inspectors use a unique lock box code for each property to be secured.

o.   Servicer shall implement written policies and procedures that prohibit inspectors from harassing occupants, threatening occupants with dispossession, or otherwise violating the applicable law relating to the property rights of occupants. Servicer must ensure that inspectors are trained in these policies and procedures, and Servicer must ensure that inspectors are trained in the applicable law

A-16

relating to the property rights of occupants. Servicer shall or shall cause any property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

p.   Credible consumer complaints and the accuracy of vacancy and abandonment determinations shall factor into Servicer's evaluation of inspectors and any other tool that determines the amount, frequency, or priority of future work orders.  Servicer shall maintain in its records the score cards and other tools used to evaluate inspectors, including records relating to the consumer complaints and the accuracy of vacancy and abandonment determinations that factored into each evaluation. Servicer shall evaluate inspectors in accordance with this paragraph on at least a monthly basis.

q.   Servicer shall implement written policies and procedures that prohibit inspectors from harassing tenants, threatening tenants with dispossession, or otherwise violating the applicable law relating to the property rights of tenants. Servicer must ensure that inspectors are trained in these policies and procedures, and Servicer must ensure that inspectors are trained in the applicable law relating to the property rights of tenants. Servicer shall take or cause its property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall not secure property that is occupied by tenants, and the obligations of Servicer with respect to "occupants" as described in this paragraph (II.D) shall apply to tenants. Servicer shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

6.   For REO properties, Servicer must comply with the following obligations:

a.   Once a property changes from a pre-REO status to a REO status, Servicer shall not remove any personal property except where permitted by law.

b.   Servicer shall make reasonable efforts to determine whether the property is occupied by tenants. Servicer must document the reasonable efforts undertaken to make this determination. Servicer shall not secure or remove personal property from a property that is occupied by tenants unless and until Servicer has obtained an order of possession against the tenants, or the securing, eviction, or removal of personal property is otherwise authorized by law.

c.   Servicer shall implement written policies and procedures that prohibit inspectors (including, but not limited to, real estate agents

or any other representative used with respect to REO property) from harassing tenants, threatening tenants with dispossession, or otherwise violating the applicable law relating to the property rights of tenants. Servicer must ensure that inspectors are trained in these policies and procedures, and Servicer must ensure that inspectors are trained in the applicable law relating to the property rights of tenants. Servicer shall take or shall cause its property preservation vendor to take appropriate disciplinary action, including termination, if an inspector violates these policies or procedures. Servicer shall require that the training described in this paragraph shall occur upon hire of the inspector and shall be repeated no less than annually.

III.   **BANKRUPTCY.**

    A.   General.

        1.   The provisions, conditions, and obligations imposed herein are intended to be interpreted in accordance with applicable federal, state, and local laws, rules, and regulations. Nothing herein shall require a Servicer to do anything inconsistent with applicable state or federal law, including the applicable Bankruptcy Law or a court order in a bankruptcy case.

        2.   Servicer shall ensure that employees who are regularly engaged in servicing mortgage loans as to which the borrower or mortgagor is in bankruptcy receive training specifically addressing bankruptcy issues.

    B.   Chapter 13 Cases.

        1.   In any chapter 13 case, Servicer shall ensure that:

            a.   So long as the debtor is in a chapter 13 case, within 180 days after the date on which the fees, expenses, or charges are incurred, file and serve on the debtor, debtor's counsel, and the trustee a notice in a form consistent with Official Form B 410S-2 itemizing fees, expenses, or charges (1) that were incurred in connection with the claim after the bankruptcy case was filed, (2) that the holder asserts are recoverable against the debtor or against the debtor's principal residence, and (3) that the holder intends to collect from the debtor.

            b.   Servicer replies within time periods established under Bankruptcy Law to any notice that the debtor has completed all payments under the plan or otherwise paid in full the amount required to cure any pre-petition default.

            c.   If Servicer fails to provide information as required by paragraph III.B.1.a with respect to a fee, expense, or charge within 180 days of the incurrence of such fee, expense, or charge, then,

                i.   Except for independent charges ("Independent Charge") paid by Servicer that is either (A) specifically authorized by the borrower or (B) consists of amounts advanced by

A-18

Servicer in respect of taxes, homeowners association fees, liens, or insurance, such fee, expense, or charge shall be deemed waived and may not be collected from the borrower.

ii.    In the case of an Independent Charge, the court may, after notice and hearing, take either or both of the following actions:

(a)    Preclude the holder from presenting the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless; or

(b)    Award other appropriate relief, including reasonable expenses and attorneys' fees caused by the failure.

d.    If Servicer fails to provide information as required by paragraphs III.B.1.a or III.B.1.b and Bankruptcy Law with respect to a fee, expense, or charge (other than an Independent Charge) incurred more than 45 days before the date of the reply referred to in paragraph III.B.1.b, then such fee, expense, or charge shall be deemed waived and may not be collected from the borrower.

e.    Servicer shall file and serve on the debtor, debtor's counsel, and the trustee a notice in a form consistent with Official Form B 410S-1 of any change in the payment amount, including any change that results from an interest rate or escrow account adjustment, no later than 21 days before a payment in the new amount is due. Servicer shall waive and not collect any late charge or other fees imposed solely as a result of the failure of the borrower timely to make a payment attributable to the failure of Servicer to give such notice timely.

f.    Within seven days after filing a POC or filing a MRS, whichever occurs first, Servicer shall notify borrowers or borrowers' counsel in writing that they may receive, upon written request:

(a)    A copy of the borrower's payment history since the borrower was last less than 60 days past due;

(b)    A copy of the borrower's note;

(c)    If Servicer has commenced foreclosure or filed a POC, copies of any assignments of mortgage or deed of trust required to demonstrate the right to foreclose on the borrower's note under applicable state law; and

(d)    The name of the investor that holds the borrower's loan.

g.    As described in paragraph III.B.1.f, above, Servicer shall respond to a borrower's written request in writing, no later than 30 days after receipt of a borrower's written request.

## IV.   LOSS MITIGATION.

These requirements are intended to apply to both government-sponsored and proprietary loss mitigation programs and shall apply to subservicers performing loss mitigation services on Servicer's behalf. Loss mitigation application means an oral or written request for a loss mitigation option that is accompanied by any information required by the Servicer for evaluation for a loss mitigation option. Loss mitigation option means an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the Servicer to the borrower.

A.    Loan Modification Requirements.

1.    Servicer shall offer and facilitate loan modifications or other loss mitigation options which meet agency and investor guidelines to borrowers, rather than initiating and pursuing foreclosure actions. Nothing in this paragraph shall require Servicer to utilize net present value ("NPV") calculations for purposes of evaluating loan modifications where the investor does not use NPV when evaluating loan modifications.

2.    Servicer shall make the following information available on a publically-accessible website:

a.   Information on its qualification process for a loan modification;

b.   Required documentation for a loan modification;

c.   Information necessary for a complete loan modification application;

d.   Key eligibility factors for loan modifications;

e.   Loan modification waterfalls; and

f.   Loan modification terms.

3.    Servicer shall offer loan modifications intended to produce sustainable modifications according to investor guidelines and previous results.

4.    Servicer shall offer loan modifications that provide affordable payments for borrowers needing longer term or permanent assistance.

5.    Servicer shall only include bona fide and reasonable fees and costs when capitalizing arrearages in order to evaluate a borrower for a loan modification.

6.    Servicer shall track outcomes and maintain records regarding characteristics and performance of loan modifications.

7.    Servicer shall not charge any application or processing fees for loan modifications.

8.    Servicer shall not demand a lump sum payment as a prerequisite to evaluation for, or the granting of, a loan modification.

9.    Servicer shall within 15 days of receiving the final trial period payment, send by written and by electronic means (if available and requested by the borrower) a final modification agreement to borrowers who have enrolled in a trial period plan and who have made the required number of timely trial period payments, where the modification is underwritten prior to the trial period and has received any necessary investor, guarantor, or insurer approvals. The borrower shall then be converted by Servicer to a permanent modification upon execution of the final modification documents, consistent with applicable program guidelines, absent evidence of fraud.

B.    Dual Track Restricted.

1.    If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loss mitigation application (as defined by paragraph IV.F.1) from the borrower more than 37 days before a scheduled foreclosure sale, then while such loss mitigation application is pending, Servicer shall not move for foreclosure judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or conduct a foreclosure sale. If Servicer offers the borrower a loan modification, Servicer shall not move for judgment or order of sale (or, if a motion has already been filed, shall take reasonable steps to avoid a ruling on such motion), or conduct a foreclosure sale until the earlier of (a) 14 days after the date of the related offer of a loan modification; or (b) the date the borrower declines the loan modification offer. If the borrower accepts the loan modification offer (verbally, in writing (including e-mail responses) or by submitting the first trial modification payment) within 14 days after the date of the related offer of loan modification, Servicer shall continue this delay until the later of (if applicable) (a) the Servicer failing to timely receive the first trial period payment; or (b) if Servicer timely receives the first trial period payment, after the borrower breaches the trial plan. For purposes of this paragraph (IV.B.1), Servicer shall not be responsible for failing to obtain a delay in a ruling on a judgment or a motion for judgment if Servicer made a request for such delay, pursuant to any state or local law, court rule, or customary practice, and such request was not approved. Where Servicer or counsel retained by Servicer fails to take reasonable steps to avoid a ruling on a motion that was pending at the time a complete loss mitigation application is received or issuance of an order with respect to such a motion, the Servicer must dismiss the foreclosure proceeding if necessary to avoid the sale.

2.    If the loan modification requested by a borrower described in paragraph IV.B.1 is denied, then, except when otherwise required by federal or state law or investor directives, if borrower is entitled to an appeal under paragraph IV.G, Servicer will not proceed to a foreclosure sale until the later of (if applicable):

a.    Expiration of the 14-day appeal period; or

b.    If the borrower appeals the denial, until the later of (if applicable) (i) if Servicer denies borrower's appeal, 15 days after the letter denying the appeal, (ii) if Servicer sends borrower a letter granting his or her appeal and offering a loan modification, 14 days after the date of such offer, (iii) if the borrower timely accepts the loan modification offer (verbally, in writing (including e-mail responses), or by making the first trial period payment), after the failure of Servicer timely to receive the first trial period payment, or (iv) if Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

3.    If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loan modification application within 37 to 15 days before a scheduled foreclosure sale, then Servicer shall conduct a review of the borrower's application and postpone any foreclosure sale, if necessary to review the borrower's application. If the borrower is extended a loan modification offer, Servicer shall continue to postpone any foreclosure sale until the earlier of (a) 14 days after the date of the related evaluation notice; or (b) the date the borrower declines the loan modification offer. If the borrower timely accepts the loan modification offer (either in writing or by submitting the first trial modification payment), Servicer shall delay the foreclosure sale until the later of (if applicable) (a) the Servicer failing to timely receive the first trial period payment; or (b) if Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

4.    If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loan modification application less than 15 days before a scheduled foreclosure sale, Servicer must notify the borrower before the foreclosure sale date as to Servicer's determination (if its review was completed) or inability to complete its review of the loan modification application. If Servicer makes a loan modification offer to the borrower, then Servicer shall postpone any sale until the earlier of (a) 14 days after the date of the related evaluation notice; or (b) the date the borrower declines the loan modification offer. If the borrower timely accepts a loan modification offer (either in writing or by submitting the first trial modification payment), Servicer shall delay the foreclosure sale until the later of (if applicable) (a) the Servicer failing to timely receive the first trial period payment; or (b) if Servicer timely receives the first trial period payment, after the borrower breaches the trial plan.

5.    For purposes of paragraphs IV.B.3 and IV.B.4, Servicer shall not be responsible for failing to obtain a delay in a ruling on a judgment or a motion for judgment if Servicer made a request for such delay, pursuant to any state or local law, court rule, or customary practice, and such request was not approved.

6. Servicer shall not move to judgment or order of sale or proceed with a foreclosure sale under any of the following circumstances:

   a. The borrower is in compliance with the terms of a trial loan modification, forbearance, or repayment plan;

   b. The borrower has been approved by Servicer to participate in a short sale, and the property is in a marketing or listing period; or

   c. A short sale or deed-in-lieu of foreclosure has been approved by all parties (including, for example, first lien investor, junior lien holder and mortgage insurer, as applicable).

7. If a foreclosure or trustee's sale is continued (rather than cancelled) to provide time to evaluate loss mitigation options, Servicer or its counsel shall notify borrower by written and electronic means (if available) of the new date of sale promptly but no later than as required by applicable law.

8. Servicer shall ensure timely and accurate communication of or access to relevant loss mitigation status and changes in status to its foreclosure attorneys, bankruptcy attorneys, and foreclosure trustees and, where applicable, to court-mandated mediators.

C. Single Point of Contact.

1. Servicer shall establish an easily accessible and reliable single point of contact for each potentially-eligible first lien mortgage borrower so that the borrower has access to an employee of Servicer to communicate through verbal and electronic means (if available) throughout the loss mitigation, loan modification, and foreclosure processes. For purposes of this Agreement, single point of contact ("SPOC") means an individual who has the ability and authority to perform the responsibilities described in this paragraph (IV.C).

2. Servicer shall identify the SPOC to the borrower within five business days after a potentially eligible borrower requests loss mitigation assistance by written means. Servicer shall provide one or more direct means of communication with the SPOC on loss mitigation-related correspondence with the borrower. Servicer shall within five business days provide updated contact information to the borrower if the designated SPOC is reassigned or no longer employed by Servicer, or otherwise not able to act as the primary point of contact.

3. Servicer shall ensure that debtors in bankruptcy are assigned to a SPOC specially trained in bankruptcy issues.

4. The SPOC shall have primary responsibility for:

   a. Communicating the options available to the borrower, the actions the borrower must take to be considered for these options, and the status of Servicer's evaluation of the borrower for these options;

   b. Coordinating receipt of all documents associated with loan

A-23

        modification or loss mitigation activities;

c.      Being knowledgeable about the borrower's situation and current status in the delinquency/imminent default resolution process; and

d.      Ensuring that all communications with borrowers are properly documented in Servicer's system of record, including sufficient information to identify the SPOC or representative who communicated with the borrower, and the date each communication took place.

5.      The SPOC shall, at a minimum, provide the following services to borrowers:

a.      Contact the borrower and introduce himself/herself as the borrower's SPOC;

b.      Explain programs for which the borrower is eligible;

c.      Explain the requirements of the programs for which the borrower is eligible;

d.      Explain program documentation requirements;

e.      Provide basic information about the status of borrower's account, including pending loan modification applications, other loss mitigation alternatives, and foreclosure activity;

f.      Notify borrower of missing documents and provide an address or electronic means for submission of documents by borrower in order to complete the loan modification application;

g.      Communicate Servicer's decision regarding loan modification applications and other loss mitigation options to borrower in writing;

h.      Assist the borrower in pursuing alternative non-foreclosure options upon the denial of a loan modification;

i.      If a loan modification is approved, call and speak with the borrower to explain the program;

j.      Provide information regarding credit counseling where necessary;

k.      Assist the borrower to clear any internal processing requirements; and

l.      Have access to individuals with the ability to stop foreclosure proceedings when necessary to comply with this Agreement or any other legal requirement.

6.      The SPOC shall remain assigned to borrower's account and available to borrower until such time as Servicer determines in good faith that all loss mitigation options have been exhausted, borrower's account becomes current or, in the case of a borrower in bankruptcy, the borrower has exhausted all loss mitigation options for which the borrower is potentially eligible and has applied.

7.      Servicer shall ensure that a SPOC can refer and transfer a borrower to an appropriate supervisor upon request of the borrower.

8.      Servicer shall ensure that relevant records relating to borrower's account are promptly available to the borrower's SPOC, so that the SPOC can timely, adequately, and accurately inform the borrower of the current status of loss mitigation, loan modification, and foreclosure activities.

9.      Servicer shall designate one or more management level employees to be the primary contact for the state Attorneys General, state financial regulators, the Executive Office of U.S. Trustee, each regional office of the U.S. Trustee, and federal regulators for communication regarding complaints and inquiries from individual borrowers. Servicer shall provide a written acknowledgment to all such inquiries within five business days or the time frame prescribed in the complaint or inquiry. Servicer shall provide a substantive written response to all such inquiries within 30 days or the time frame prescribed in the complaint or inquiry. Servicer shall provide relevant loan information to borrower and to state Attorneys General, state financial regulators, federal regulators, the Executive Office of the U.S. Trustee, and each U.S. Trustee upon written request and if properly authorized. A written complaint filed by a borrower and forwarded by a state Attorney General or financial regulatory agency to Servicer shall be deemed to have proper authorization.

10.     Servicer shall establish and make available to chapter 13 trustees a toll-free telephone number staffed by persons trained in bankruptcy to respond to inquiries from chapter 13 trustees.

D.      Loss Mitigation Communications with Borrowers.

1.      No later than the 36th day of delinquency, Servicer shall conduct affirmative outreach efforts to inform delinquent borrowers of loss mitigation options. The use by Servicer of nothing more than prerecorded automatic messages in loss mitigation communications with borrowers shall not be sufficient in those instances in which it fails to result in contact between the borrower and one of Servicer's loss mitigation specialists.

2.      Servicer shall disclose and provide accurate information to borrowers relating to the review requirements and process for loss mitigation programs.

3.      Servicer shall communicate, at the written request of the borrower, with the borrower's authorized representatives, including housing counselors. Servicer shall communicate with representatives from state Attorneys General and financial regulatory agencies acting upon a written complaint filed by the borrower and forwarded by the state Attorney General or financial regulatory agency to Servicer. When responding to the borrower regarding such complaint, Servicer shall include the applicable state Attorney General or financial regulatory agency on the written response with the borrower regarding such complaint.

A-25

4. Servicer shall cease collection efforts while the borrower (a) is making timely payments under a trial loan modification or (b) has submitted a complete loan modification application, and a modification decision is pending. Notwithstanding the above, Servicer reserves the right to contact a borrower to gather required loss mitigation documentation, to assist a borrower with performance under a trial loan modification plan, or to discuss other servicing non-collection related matters.

5. As indicated in paragraph I.A.13, Servicer (including any attorney or trustee conducting foreclosure proceedings at the direction of Servicer) shall send a written communication to the borrower that includes clear language that:

    a. The borrower can still be evaluated for alternatives to foreclosure by submitting a loss mitigation application to Servicer;

    b. The borrower can reapply for loss mitigation, even if borrower has previously been denied, if the borrower has experienced a change in financial circumstances; and

    c. Provides Servicer's contact information for requesting a complete loss mitigation application package and for submitting a complete loss mitigation application, including Servicer's toll-free telephone number.

E. Development of Loan Portals for use by Borrowers.

1. Servicer shall develop or contract with a third-party vendor to develop an online portal linked to Servicer's primary servicing system for communication with borrowers.

2. Servicer shall design portals that will, among other things:

    a. Enable documents to be submitted electronically;

    b. Provide an electronic receipt for any documents submitted; and

    c. Provide general review requirements for loan modification and other loss mitigation programs.

F. Loss Mitigation Timelines.

1. Servicer shall notify borrower in writing of any known deficiency in the borrower's loss mitigation application, no later than five business days after receipt, including any missing information or documentation required for the loss mitigation application to be considered complete. For purposes of this Agreement, a complete loss mitigation application means an application in connection with which Servicer has received all the information that Servicer requires from the borrower in evaluating applications for the loss mitigation options available to the borrower. Servicer shall exercise reasonable diligence in obtaining documents and information to complete a loss mitigation application.

2.      Subject to paragraph IV.B, Servicer shall afford borrower a reasonable date from the date of Servicer's notification of any missing information or documentation (whether contained in the five-day letter in paragraph IV.F.1 or additional missing items letter) to supplement borrower's submission of information prior to making a determination on whether or not to offer a loss mitigation option. In general, and subject to paragraph IV.B, Servicer complies with the requirement to include a reasonable date by including a date that is 30 days after the date the Servicer provides the borrower with the written notice in IV.F.1 or additional missing items letter. The reasonable date, however, must be no later than the nearest remaining milestone listed in IV.F.2.i-iv (below) even if it will occur earlier than 30 days, subject to a minimum seven days after Servicer provides the borrower with the notice in IV.F.1 or additional missing items letter:

   i.      The date by which any document or information submitted by a borrower will be considered stale or invalid pursuant to any requirements applicable to any loss mitigation option available to the borrower;

   ii.     The date that is the 120th day of the borrower's delinquency;

   iii.    The date that is 90 days before a foreclosure sale; and

   iv.     The date that is 38 days before a foreclosure sale.

3.      Within five business days of receiving a borrower's complete loss mitigation application, Servicer shall notify the borrower by written and electronic means (if available and requested by the borrower) when a loss mitigation application is complete. The notice of complete application must inform the borrower the date Servicer received the complete application; whether a foreclosure sale was scheduled as of the date Servicer received the complete application; and if a foreclosure sale was scheduled, the date of that scheduled sale.

4.      Servicer shall review the complete loss mitigation application submitted by borrower and shall determine the disposition of borrower's loss mitigation application no later than 30 days after receipt of the complete loss mitigation application.

5.      Servicer shall provide the borrower with an approval notice in writing stating Servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage within 30 days of receiving the borrower's complete loss mitigation application.

6.      Except when evaluated as provided in paragraphs IV.B.3 or IV.B.4, Servicer's denial of an eligible borrower's request for loss mitigation following the submission of a complete loss mitigation application shall be subject to an independent evaluation. Such evaluation shall be performed by an independent entity or a different employee who has not been involved with the particular loss mitigation application.

7. When a loss mitigation application is denied (after the independent evaluation in paragraph IV.F.6 of this Agreement is performed), Servicer shall send a written non-approval notice to the borrower within 30 days of receiving the borrowers complete loss mitigation application. Servicer shall identify in this non-approval notice the specific reason or reasons for denial. The notice shall further inform a borrower that is eligible to appeal the decision, pursuant to paragraph IV.G.1 of this Agreement, that he or she has 14 days from the date of the written non-approval notice to provide evidence that the eligibility determination was in error. If a loan modification application is denied because it is disallowed by an investor, Servicer shall disclose in the written non-approval notice the name of the investor and summarize the reasons for the investor's denial. For those cases where a loan modification application denial is the result of an NPV calculation, Servicer shall provide in the written non-approval notice the input values used in the calculation.

8. For all loss mitigation programs, Servicer shall allow properly submitted borrower financials to be used for 90 days from the date on the documents, unless Servicer learns that there has been a material change in financial circumstances or unless investor requirements mandate a shorter time frame.

9. Servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless a borrower's mortgage loan obligation is more than 120 days delinquent.

G. Appeal Process.

1. If Servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph IV.F.9 of this Agreement, Servicer shall permit a borrower to appeal the Servicer's determination to deny a borrower's loss mitigation application for any trial or permanent loan modification program available to the borrower. Servicer shall permit a borrower to make an appeal within 14 days after the automatic review in paragraph IV.F.6 of this Agreement has been completed and Servicer provides the written approval notice or the written non-approval notice to the borrower, pursuant to paragraphs IV.F.5 and IV.F.7 of this Agreement. An appeal shall be reviewed by different personnel than those responsible for evaluating the borrower's complete loss mitigation application.

2. For those cases in which the loan modification denial is the result of an NPV or loan-to-value ("LTV") calculation, the written non-approval notice must advise the borrower that if a borrower disagrees with the property value used by Servicer in the NPV or LTV test, the borrower can request (within 14 days of the denial notice) that Servicer obtain a full appraisal of the property by an independent licensed appraiser at the borrower's expense. Servicer shall document a borrower's request of a full appraisal of the property by an independent licensed appraiser in its system of record. Upon

receipt of the appraisal, Servicer must perform a final NPV or LTV re-evaluation using the appraised value and any other NPV or LTV input values materially disputed by the borrower. Servicer must provide the final NPV or LTV outcome and input values to the borrower in the final disposition letters described in paragraphs IV.G.3 and IV.G.4, below. If the re-evaluation with the new appraised value results in a trial period plan, the actual appraisal cost will be capitalized in conjunction with the permanent modification.

3.      Servicer shall review the information submitted by borrower and use its best efforts to communicate the disposition of borrower's appeal to borrower by written means no later than 30 days after receipt of the information.

4.      If Servicer denies borrower's appeal, Servicer's appeal denial letter shall include a description of other available loss mitigation options, including, but not limited to, short sales and deeds in lieu of foreclosure.

H.      General Loss Mitigation Requirements.

1.      Servicer shall maintain adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, and other Servicer operations. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

2.      Servicer shall maintain adequate staffing and caseload limits for SPOCs and employees responsible for handling foreclosure, loss mitigation, and related communications with borrowers and housing counselors. Servicer shall make periodic assessments to ensure that its staffing and systems are adequate.

3.      Servicer shall establish reasonable minimum experience, educational, and training requirements for loss mitigation staff.

4.      Servicer shall document electronically key actions taken on a foreclosure, loan modification, or other loss mitigation relief, bankruptcy, or other servicing file, including verbal communications with the borrower.

5.      Servicer shall not adopt compensation arrangements for its employees that encourage foreclosure over loss mitigation alternatives.

6.      Servicer shall not make inaccurate payment delinquency reports to credit reporting agencies when the borrower is making timely reduced payments pursuant to a trial or other loan modification agreement. Servicer shall provide the borrower, prior to entering into a trial loan modification, with clear and conspicuous written information that adverse credit reporting consequences may result from the borrower making reduced payments during the trial period.

7.      Servicer shall ensure that all loan modifications be in writing. Where Servicer grants a loan modification, Servicer shall provide borrower with a copy of the fully executed loan modification agreement within 45 days of receipt of the executed copy from the borrower.  Servicer shall not instruct,

advise, or recommend that borrowers go into default in order to qualify for loss mitigation relief.

8.    Servicer shall not discourage borrowers from working or communicating with legitimate non-profit housing counseling services.

9.    Servicer shall not, in the ordinary course, require a borrower to waive or release claims and defenses as a condition of approval for a loan modification program or other loss mitigation relief. However, nothing herein shall preclude Servicer from requiring a waiver or release of claims and defenses with respect to a loan modification offered in connection with the resolution of a contested claim, when the borrower would not otherwise be qualified for the loan modification under existing Servicer programs.

10.    Servicer shall not charge a borrower an application fee in connection with a request for a loan modification. Servicer shall provide the borrower with a pre-paid envelope or pre-paid address label for return of a loan modification application.

11.    Notwithstanding any other provision of this Agreement, and to minimize the risk of borrowers submitting multiple loss mitigation requests for the purpose of delay, Servicer shall not be obligated to evaluate requests for loss mitigation options from borrowers who were evaluated after the date of implementation of this Agreement, consistent with this Agreement, unless there has been a material change in the borrower's financial circumstances that is documented by borrower and submitted to Servicer.

12.    A borrower's prior chapter 7 discharge should not impact his or her eligibility for loss mitigation.

13.    Successors in Interest.

    a.    For purposes of this paragraph (IV.H.13), from the Effective Date of this Agreement until and including April 18, 2018, Successor in Interest means a person to whom an ownership interest in property securing a mortgage loan subject to this Agreement is transferred from a borrower, provided that the transfer is by devise, descent, or operation of law on the death of a joint tenant by the entirety or other transfer to a relative resulting from the death of a borrower.

    b.    For purposes of this paragraph (IV.H.13), effective April 19, 2018, and throughout the remaining Term of this Agreement, Successor in Interest shall mean a person to whom an ownership interest in a property securing a mortgage loan subject to this Agreement is transferred from a borrower, provided that the transfer is:

        i.    A transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;

        ii.    A transfer to a relative resulting from the death of a borrower;

        iii.    A transfer where the spouse or children of the borrower become an owner of the property;

iv.   A transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property; or

v.   A transfer into an inter vivos trust in which the borrower is and remains a beneficiary and which does not relate to a transfer of rights of occupancy in the property.

c.   For purposes of this paragraph (IV.H.13), a Confirmed Successor in Interest means a Successor in Interest once the Servicer has confirmed the Successor in Interest's identity and ownership interest in a property that secures a mortgage loan subject to this Agreement.

d.   Servicer shall implement policies and procedures that are reasonably designed to ensure Servicer can promptly identify and facilitate communications with a potential Successor in Interest upon notification of the death of a borrower or another transfer of a property securing a mortgage loan. For purposes of this paragraph (IV.H.13), a Potential Successor in Interest means an individual who asserts an ownership interest in real property secured by a mortgage loan as a result of any of the circumstances arising under paragraphs IV.H.13.a-b.

e.   Upon receipt of a loss mitigation application from a potential Successor in Interest or a written request from a Potential Successor in Interest that includes the name of the prior borrower and information that enables Servicer to identify the borrower's mortgage loan account, Servicer shall promptly send a written notice to the Potential Successor in Interest with a description of the documents Servicer requires in order to confirm that the requestor is a Successor in Interest in the property.

f.   Servicer's request for documentation shall be tailored to the specific type of transfer that gives rise to the Successor in Interest's ownership interest. Servicer shall not require a Potential Successor in Interest to submit documentation which is not required by applicable law in order to prove the ownership interest.

g.   Upon receipt of all documents requested by Servicer, Servicer shall send a written and electronic (if available) notice confirming or denying the requestor's status as a Successor in Interest or identifying any additional documents that are required within five business days.

h.   Servicer may condition the offer of a loan modification to a Confirmed Successor in Interest upon assumption of the loan.

14.   Servicer shall treat government benefits as a legitimate source of income for the purposes of evaluating borrowers for loan modification options and shall not require additional information regarding the manner in which the government benefits are used by borrowers. Notwithstanding this provision,

Servicer shall not be required to consider unemployment benefits as a legitimate source of income for purposes of evaluating borrowers for loan modification options.

I.     Short Sales.

1.     General Provisions.

a.     Servicer shall make publicly available information on general requirements for the short sale process.

b.     Servicer shall offer appropriate investor approved monetary incentives to underwater borrowers to facilitate short sale options.

c.     Servicer shall develop a cooperative short sale process which allows the borrower the opportunity to engage with Servicer to pursue a short sale evaluation prior to putting home on the market.

d.     When Servicer conditionally approves borrower for a short sale, Servicer shall send a notice to the borrower within 30 days of receiving the loss mitigation application that includes basic information about the short sale process, Servicer's requirements, and states clearly and conspicuously that Servicer may demand a deficiency payment if such deficiency claim is permitted by applicable law.

e.     If the short sale request is accepted, Servicer shall contemporaneously notify the borrower whether Servicer or investor will demand a deficiency payment or related cash contribution and the approximate amount of that deficiency, if such deficiency obligation is permitted by applicable law.

f.     If the short sale request is denied, Servicer shall provide reasons for the denial in the written notice. If Servicer waives a deficiency claim, it shall not sell or transfer such claim to a third-party debt collector or debt buyer for collection.

J.     Loss Mitigation During Bankruptcy.

1.     Servicer may not deny any loss mitigation option to eligible borrowers on the basis that the borrower is a debtor in bankruptcy so long as borrower and any trustee cooperates in obtaining any appropriate approvals or consents.

2.     Servicer shall, to the extent reasonable, continue to accept payments under trial period loan modification plans as necessary to accommodate delays in obtaining bankruptcy court approvals or receiving full remittance of debtor's trial period payments that have been made to a chapter 13 trustee. In such event, the debtor must make a trial period payment for each additional month of the trial period, including any months during which such accommodation is necessary, and Servicer shall not revoke or withdraw any modification offer while final bankruptcy court approval of such modification is pending.

    3.    When the debtor is in compliance with a trial period or permanent loan modification plan, Servicer will not object to confirmation of the debtor's chapter 13 plan, move to dismiss the pending bankruptcy case, or file a MRS solely on the basis that the debtor paid only the amounts due under the trial period or permanent loan modification plan, as opposed to the non-modified mortgage payments.

K.    Transfer of Servicing of Loans.

    1.    This paragraph (IV.K) shall apply to all sales or transfers of servicing, including subservicing.

    2.    At the time of transfer or sale, Servicer shall inform the successor servicer whether a loss mitigation application is pending.

    3.    Transfer of Servicing to Servicer.

        a.    Servicer must accept and continue to process pending loss mitigation applications from the prior servicer.

            i.    Servicer must process pending loss mitigation applications upon the same time frames that applied to the transferor servicer prior to the transfer, except in the following situations:

                (a)    If the transferor servicer received a loss mitigation application but had not yet sent the borrower a letter either confirming that the application is complete or identifying missing documents or information, Servicer must send such a letter within 10 days of the transfer date.

                (b)    If the transfer servicer received a complete loss mitigation application but had not yet completed its evaluation, Servicer must complete the loss mitigation evaluation within 30 days of the transfer date.

            ii.    Servicer may not attempt to obtain from the borrower any missing information or documents that were previously submitted by the borrower to the transferor servicer, without first contacting the transferor servicer to attempt to obtain the missing information or documents.

            iii.    If the transferor servicer denied a loan modification application prior to the transfer and the denial notice provides the borrower with the right to appeal the denial, Servicer must honor the appeal deadline before taking any adverse action against the borrower. If there is a pending appeal at the time of the transfer, or if an appeal is made after the transfer date, the Servicer must make a determination within 30 days of the transfer date or within 30 days of the

date the borrower made the appeal, whichever is later. If Servicer is unable to make a determination as to the appeal, Servicer must treat the borrower's application as a pending complete application as of the date the appeal was received by the transferor servicer or Servicer, whichever occurs first, and evaluate the borrower for all loss mitigation options.

iv.   Where a loan file indicates that a loss mitigation request was pending within 60 days of transfer or a borrower indicates the same, and Servicer lacks clear written evidence of a loss mitigation denial by the prior servicer, Servicer shall take all reasonable steps to obtain confirmation from the prior servicer of the status of any loss mitigation activity or review of a loss mitigation request and shall:

(a)   Where the prior servicer's review was not complete, complete the review of the borrower's prior loss mitigation request, after notifying the borrower of any necessary information missing from such application, and afford the borrower an opportunity to have the loss mitigation request reviewed through the independent evaluation and appeal process under paragraphs IV.F.6 and IV.G; or

(b)   Provide the borrower a written denial notice, in compliance with paragraph IV.F.7, and if the denial is of a trial plan or loan modification, provide the borrower 14 days to request an appeal under paragraph IV.G.

b.   Servicer must honor trial and permanent loan modification agreements entered into by the prior servicer.

i.   If the transferor servicer extended a trial or permanent loan modification offer to the borrower and the borrower's time period to accept or reject the offer has not expired as of the transfer date, Servicer must ensure that the borrower has 14 days from the date of transfer to accept or reject the offer.

ii.   If Servicer does not have evidence of a loan modification offer or agreement from the transferring servicer, but the borrower provides a copy of a loan modification offer or agreement, and the borrower has complied in good faith with the terms of that offer or agreement, that shall be deemed evidence of a loan modification offer or agreement. A borrower making payments that conform to the payment terms of the offer shall be deemed to be the borrower's good faith compliance with the terms of the offer or agreement. However, if Servicer reasonably suspects potential fraud on the part of the borrower or their authorized agent, it may

A-34

perform additional due diligence to confirm the validity of the loan modification offer or agreement, which shall include, but is not limited to, reasonable diligence in contacting the prior servicer before agreeing to honor the offer or agreement.

iii.   Servicer must ensure that trial period payments, including those received by the prior servicer, are applied in accordance with the trial period plan.

iv.   Servicer must ensure that post-modification payments, including those received by the prior servicer, are applied in accordance with the modified loan documents.

c.   Within 15 days after the transfer, Servicer must send a written notice to the borrower that contains the following items:

i.   The effective date of transfer of the servicing;

ii.   The name, address, and a collect call or toll-free telephone number for an employee or department of the transferee servicer that can be contacted by the borrower to obtain answers to servicing transfer inquiries;

iii.   The name, address, and a collect call or toll-free telephone number for an employee or department of the transferor servicer that can be contacted by the borrower to answer inquiries relating to the transfer of servicing;

iv.   The date on which the transferor servicer will cease to accept payments relating to the loan and the date on which the transferee servicer will begin to accept such payments. These dates shall either be the same or consecutive days;

v.   Whether the transfer will affect the terms or the continued availability of mortgage life or disability insurance, or any other type of optional insurance, and any action the borrower must take to maintain such coverage;

vi.   A statement that the servicing transfer does not affect any term or condition of the security instrument other than terms directly related to the servicing of such loan;

vii.   The date for which the loan is due and the total amount of the unpaid principal balance;

viii.   If there is an escrow account, Servicer must provide the escrow account balance according to the records received by Servicer; and

ix.   If Servicer is aware that there is a pending loss mitigation application or pending trial plan at the time of transfer, Servicer must acknowledge that there is a pending

application and that a review for a permanent payment solution is in process.

d.     Within five days after delivery of the notice in paragraph IV.K.3.c (above), Servicer shall provide to any borrower that is at least 30 days delinquent at the time of transfer a notice indicating that the loan was delinquent at time of transfer according to the records received by Servicer.

e.     For the 60 days beginning on the effective date of the transfer of servicing of any mortgage loan, if the transferor servicer (rather than the transferee Servicer that should properly receive payment on the loan) received payment on or before the applicable due date (including any grace period allowed under the mortgage loan instruments), a payment may not be treated as late for any purpose.

    i.     Servicer shall not charge or collect a late fee for any such payment.

    ii.     Servicer must report any such payment as a timely made payment to credit reporting agencies, and Servicer shall not provide any adverse information about any such payment to credit reporting agencies.

f.     Servicer shall not commence, refer to, or proceed with foreclosure until Servicer has satisfied all requirements under paragraphs IV.K.3.a and IV.K.3.b.

4.   Additional Requirements for Transfer of Servicing of Loans where the Borrower is in Bankruptcy.

a.     The following shall apply to all transfers of servicing rights to a third party from Servicer, including subservicing:

    i.     At the time of transfer or sale, Servicer shall inform the successor servicer or subservicer whether a borrower is a debtor in a bankruptcy proceeding.

    ii.     Any contract for the transfer or sale of servicing rights entered into by Servicer shall obligate the successor servicer to ensure that payments for borrowers in active chapter 13 bankruptcy cases continue to be applied consistent with paragraphs I.B.13.a-b.

b.     The following shall apply to all transfers of servicing rights to Servicer from a third party, including prior servicers or subservicers:

    i.     At the time of transfer or sale, Servicer shall identify whether a borrower is a debtor in a bankruptcy proceeding.

    ii.     In any POC, MRS, or other document filed by or on behalf of Servicer in a bankruptcy proceeding, Servicer shall not impose or collect fees or charges assessed by a prior servicer,

unless Servicer has properly itemized and verified those fees and charges, and otherwise complied with the requirements of paragraphs I.D., III.B, and VI.

## V.   PROTECTIONS FOR MILITARY PERSONNEL.

A.   When a borrower states that he or she is or was within the preceding one year (or the then applicable statutory period under the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. § 3901 *et seq.*) in active military service or has received and is subject to military orders requiring him or her to commence active military service, Servicer shall determine whether the borrower may be eligible for the protections of the SCRA. If Servicer determines the borrower is so eligible, Servicer shall, until Servicer determines that such borrower is no longer protected by the SCRA,

   1.   If such borrower is not entitled to a SPOC, route such borrowers to employees who have been specially trained about the protections of the SCRA to respond to such borrower's questions; or

   2.   If such borrower is entitled to a SPOC, designate as a SPOC for such borrower a person who has been specially trained about the protections of the SCRA (Servicemember SPOC).

B.   Servicer shall, in addition to any other reviews it may perform to assess eligibility under the SCRA, (i) before referring a loan for foreclosure, (ii) within seven days before a foreclosure sale, and (iii) the later of (A) promptly after a foreclosure sale and (B) within three days before the regularly scheduled end of any redemption period, determine whether the secured property is owned by a servicemember covered under SCRA by searching the Defense Manpower Data Center (DMDC) for evidence of SCRA eligibility by either (a) last name and social security number, or (b) last name and date of birth.

C.   When a servicemember provides written notice of eligibility for interest rate relief under the SCRA, but does not provide the military orders required by 50 U.S.C. § 3937(b)(1), Servicer shall accept, in lieu of the documentation required by 50 U.S.C. § 3937(b)(1), a letter on official letterhead from the servicemember's commanding officer that includes  contact information for confirmation:

   1.   Setting forth the full name and Social Security number or date of birth of the servicemember; and

   2.   Setting forth the period of military service of the servicemember and, as may be applicable, that the military service of the servicemember is indefinite or the date on which the military service of the servicemember ended or is scheduled to end.

In the event that a servicemember provides written notice of eligibility for interest rate relief under the SCRA but fails to provide either (a) a copy of military orders required by 50 U.S.C. § 3937(b)(1), or (b) a letter with the content described above, Servicer shall search the DMDC to confirm eligibility. If the DMDC records provide dates of service that confirm eligibility, Servicer shall provide the relief required by the SCRA for the dates indicated by the DMDC and shall notify the servicemember

that the servicemember may submit additional documentation to establish eligibility dates if the servicemember disagrees with the dates provided by the DMDC. If the DMDC records do not confirm eligibility, Servicer may deny the relief if it informs the servicemember in writing that he or she is not eligible for the relief unless he or she provides a copy of documents establishing military service. Such documents will include any document prepared exclusively by a branch of the military, the Department of Defense, or a borrower's commanding officer that indicates that the borrower is on active duty (e.g., active duty orders, change of station orders, DD-214 forms, letters from commanding officers, etc.). Servicer shall request this additional information before making a final determination that the servicemember is not eligible for relief.

D.      Servicer shall notify borrowers who are 45 days delinquent that, if they are a servicemember, (a) they may be entitled to certain protections under the SCRA regarding the servicemember's interest rate and the risk of foreclosure, and (b) counseling for covered servicemembers is available at agencies such as Military OneSource, Armed Forces Legal Assistance, and a HUD-certified housing counselor. Such notice shall include a toll-free telephone number that servicemembers may call to be connected to a person who has been specially trained about the protections of the SCRA to respond to such borrower's questions. Such telephone number shall either connect directly to such a person or afford a caller the ability to identify him- or herself as an eligible servicemember and be routed to such persons. Servicer hereby confirms that it intends to take reasonable steps to ensure the dissemination of such toll-free number to borrowers who may be eligible servicemembers.

E.      Servicer shall not require a servicemember to be delinquent to qualify for a short sale, loan modification, or other loss mitigation relief if the servicemember is suffering financial hardship and is otherwise eligible for such loss mitigation. Subject to Applicable Requirements, for purposes of assessing financial hardship in relation to (i) a short sale or deed in lieu transaction, Servicer will take into account whether the servicemember is, as a result of a permanent change of station order, required to relocate even if such servicemember's income has not been decreased, so long as the servicemember does not have sufficient liquid assets to make his or her monthly mortgage payments, or (ii) a loan modification, Servicer will take into account whether the servicemember is, as a result of his or her military orders required to relocate to a new duty station at least seventy five mile from his or her residence/secured property or to reside at a location other than the residence/secured property, and accordingly is unable personally to occupy the residence and (a) the residence will continue to be occupied by his or her dependents, or (b) the residence is the only residential property owned by the servicemember.

F.      Servicer shall not make inaccurate reports to credit reporting agencies when a servicemember, who has not defaulted before relocating under military orders to a new duty station, obtains a short sale, loan modification, or other loss mitigation relief.

A-38

**VI.**    **RESTRICTIONS ON SERVICING FEES.**

A.    Specific Fee Provisions.

1.    Schedule of Fees. Servicer shall maintain and keep current a schedule of common state specific and non-state specific fees or ranges of fees that may be charged to borrowers by or on behalf of Servicer. Servicer shall make this schedule available to the borrower or borrower's authorized representative upon request. Servicer shall make available on its website a list of common non-state specific fees that may be charged to the borrower. For each fee identified, Servicer shall provide a plain language explanation of the fee, and state the amount of the fee or how the fee is calculated or determined. On its website Servicer shall also include information on how a borrower could obtain more specific information concerning fees, including default related fees.

2.    If a borrower or the borrower's representative requests a payment history, account ledger, or otherwise asks Servicer to explain charges on an account, Servicer must promptly provide the requested history or ledger with a plain language description of the entries on the document. If Servicer uses codes or abbreviations in the history or ledger, Servicer must provide a legend that contains plain language descriptions of any code or abbreviation that appears in the history or ledger. If a government entity requests a borrower's payment history, account ledger, or otherwise asks Servicer to explain charges on an account, pursuant to paragraph IV.C.9 of this Agreement, then Servicer shall promptly provide the information described in this paragraph (VI.A.2) to that entity.

3.    Attorneys' Fees. Attorneys' fees charged in connection with a foreclosure action or bankruptcy proceeding shall only be for work actually performed and shall not exceed reasonable and customary fees for such work. In the event a foreclosure action is terminated prior to the final judgment and/or sale for a loss mitigation option, a reinstatement, or payment in full, the borrower shall be liable only for reasonable and customary fees for work actually performed.

4.    Late Fees.

a.    Servicer shall not impose or collect any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on or before its due date or within any applicable grace period.

b.    Servicer shall not impose or collect late fees (i) based on an amount greater than the past due amount; (ii) collected from the escrow account or from escrow surplus refund without the approval of the borrower; or (iii) deducted from any regular payment.

c.    Servicer shall not impose or collect any late fees for periods during which (i) a complete loan modification application is under

consideration; (ii) the borrower is making timely trial modification payments; or (iii) a short sale offer is being evaluated by Servicer.

5. Payment Processing Fees.

a. Servicer shall not charge a borrower for submitting payments more frequently than required by the note or for submitting payments that exceed the current amount due.

b. Servicer shall not require a borrower to use any payment method (such as payment by phone) or any provider of payment processing services (payment provider) that would cause the borrower to incur a payment processing fee.

c. Servicer shall not unreasonably restrict a borrower from using a particular payment method or payment provider.

d. If Servicer promotes, directs, or refers a borrower to a particular payment method or payment provider and the payment method or payment provider would cause the borrower to incur a payment processing fee, Servicer shall, prior to obtaining the approval of a borrower to use the particular payment method or provider, accurately, clearly, and prominently disclose:

   i. That the borrower is not required to use the particular payment method or payment provider;

   ii. That Servicer accepts other payment methods which the borrower can use without incurring a fee;

   iii. That the borrower has the right to select the borrower's own payment method and provider; and

   iv. The amount of the payment processing fee.

e. If Servicer will receive or retain any portion of a payment processing fee, Servicer shall, prior to obtaining the approval of the borrower to use the particular payment provider and in addition to the disclosure required under paragraph VI.A.5.d, accurately, clearly, and prominently disclose:

   i. That Servicer has a business relationship with the provider of payment processing services; and

   ii. Any financial or other benefit which Servicer will obtain if the borrower uses the provider of payment processing services.

f. Servicer shall disclose and obtain approval from the borrower in accordance with paragraphs VI.A.5.d-e, each time a payment agreement is set up or modified.

g. All requests to modify or cancel an existing authorization for the use of a particular payment method or payment provider shall be

honored upon the borrower's first written or oral request provided that the request is received at least three business days before the scheduled date of the transfer. Servicer may require a borrower to give written confirmation of a stop-payment required within 14 days of an oral notification.

h.      Servicer shall not use unfair or deceptive acts or practices to steer borrowers to a particular payment method or payment provider.

i.      Servicer shall document all disclosures made pursuant to this paragraph (VI.A.5) and retain such disclosures in accordance with paragraph X.A.3.

B.      Third-Party Fees.

1.      Servicer shall not impose unnecessary or duplicative property inspection, property preservation, or valuation fees on the borrower, including, but not limited to, the following:

a.      No property preservation fees shall be imposed on eligible borrowers who have a pending application with Servicer for loss mitigation relief or are performing under a loss mitigation program, unless Servicer has a documented reasonable basis to believe that property preservation is necessary for the maintenance of the property, such as when the property is vacant or listed on a violation notice from a local jurisdiction;

b.      No property inspection fee shall be imposed on a borrower any more frequently than the time frames allowed under GSE or HUD guidelines unless Servicer has identified specific circumstances supporting the need for further property inspections and documented such circumstances in Servicer's system of record. Servicer and its vendors shall not program their system of record to automatically trigger property inspections with greater frequency than what is allowed under applicable law; and

c.      Servicer shall be limited to imposing property valuation fees (*e.g.*, BPO) to once every 12 months, unless other valuations are requested by the borrower to facilitate a short sale or to support a loan modification as outlined in paragraph IV.G.2, or required as part of the default or foreclosure valuation process. Pursuant to this paragraph (VI.B.1.c), Servicer shall provide the borrower with a copy of any valuation requested by the borrower.

2.      Default, foreclosure, and bankruptcy-related services performed by third parties shall be at reasonable market value.

3.      Servicer shall be prohibited from collecting any unearned fee, or giving or accepting referral fees in relation to third-party default or foreclosure-related services.

4. Servicer shall not assess to a borrower its own mark-ups on Servicer-initiated third-party default or foreclosure-related services.

C. Certain Bankruptcy Related Fees.

1. Servicer must not collect any attorneys' fees or other charges with respect to the preparation or submission of a POC or MRS document that is withdrawn or denied, or any amendment thereto that is required, as a result of a substantial misstatement by Servicer of the amount due.

2. Servicer shall not collect late fees due to delays in receiving full remittance of debtor's payments, including trial period or permanent modification payments as well as post-petition conduit payments in accordance with 11 U.S.C. § 1322(b)(5), that debtor has timely (as defined by the underlying chapter 13 plan) made to a chapter 13 trustee.

## VII. FORCE-PLACED INSURANCE.

A. General Requirements for Force-Placed Insurance.

1. Servicer shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance. For escrowed accounts, Servicer shall continue to advance payments for the homeowner's existing policy, unless the borrower or insurance company cancels the existing policy. The term "hazard insurance" means insurance on the property securing a mortgage loan that protects the property against loss caused by fire, wind, flood, earthquake, theft, falling objects, freezing, and other similar hazards for which the owner or assignee of such loan requires insurance. The term "force-placed insurance" means hazard insurance coverage obtained by Servicer on behalf of the owner or assignee of a mortgage loan that insures the property securing the loan. However, for purposes of this Section (VII), the term "force-placed insurance" does not include hazard insurance required by the Flood Disaster Protection Act of 1973.

2. Servicer shall not be construed as having a reasonable basis for obtaining force-placed insurance unless the requirements of this Section (VII) have been met.

3. Servicer shall accept any reasonable form of written confirmation from a borrower or the borrower's insurance agent of existing insurance coverage, which shall include the existing insurance policy number along with the identity of, and contact information for, the insurance company or agent.

4. All charges and coverage amounts related to force-placed insurance assessed to a borrower by or through Servicer must be bona fide and reasonable.

5. Servicer shall make reasonable efforts to work with the borrower to continue or reestablish the existing homeowner's policy if there is a lapse in payment and the borrower's payments are escrowed.

A-42

**VIII.    RESOLUTION OF ERRORS AND COMPLAINTS.**

A.    General.

    1.    For the purposes of this Section (VIII), the following definitions shall apply.

        a.    The term "Complaint" shall mean any verbal or written complaint or expression of dissatisfaction from a borrower or a borrower's authorized agent, regarding any servicing act or practice of Servicer or a Third-Party Provider; or any allegation that a particular servicing act or practice by Servicer or a Third-Party provider is unfair, deceptive, or in violation of a law, regulation, or contractual agreement.

        b.    The term "Escalated Complaint" shall mean any written Complaint that is not satisfactorily resolved, as set forth in paragraph VIII.B.6; that is initiated using any method Servicer provides for the submission of Escalated Complaints, as set forth in paragraph VIII.A.2; or that is directed to any of Servicer's officers, Board members, or senior management; or any notice of error, as that term is defined in 12 CFR 1024.25, as may be amended from time to time.

    2.    Servicer shall maintain, and shall provide written notice to borrowers of, readily available methods for the submission of Complaints, Escalated Complaints, and Notices of Error. Servicer shall post the designated methods on any website maintained by Servicer that lists any contact address for Servicer.

    3.    Servicer shall maintain a competent and adequate process for dispute escalation.

    4.    Servicer shall maintain competent and adequate staffing, systems, and policies, and shall conduct adequate reviews and audits, to ensure compliance with the provisions of this Section (VIII).

B.    Complaints.

    1.    If the representative to whom a Complaint is made is unable to receive the Complaint, that representative shall:

        a.    In the case of a verbal Complaint, promptly transfer the borrower to staff that is able to receive and respond to the Complaint; or

        b.    In the case of a written Complaint, promptly forward the complaint to the department that is able to receive and respond to the Complaint.

    2.    Servicer shall request from the complainant any information reasonably necessary to timely and accurately investigate and respond to the Complaint. In the case of a verbal Complaint, such requests shall be made verbally and contemporaneously to the extent possible. In the case of a written Complaint, such requests shall be made promptly.

    3.    Upon request, Servicer shall provide the name and operator identification of the representative to whom the complainant is currently speaking.

4.      Servicer shall promptly provide a complainant with verbal and written information about how to submit a Notice of Error upon request or if the complainant indicates that he or she would like to submit a Notice of Error or believes he or she is doing so. Indications that a complainant would like to submit a Notice of Error or believes that he or she is doing so include, but are not limited to, references to the phrase "notice of error" or references to complaint or error resolution procedures provided by the law, regulations, or the Consumer Financial Protection Bureau.

5.      Upon request, or if a representative is unable to resolve a Complaint, the Complaint shall be referred to a supervisor or manager. In the case of a verbal Complaint, the complainant shall immediately be transferred to a supervisor or a manager or, if a supervisor or manager is not readily available, the supervisor or manager shall return the complainant's call. In the case of a written Complaint, a supervisor or manager shall promptly respond to the Complaint.

6.      Servicer shall promptly provide a complainant with verbal and written information about how to submit a Notice of Error, and additionally shall immediately escalate a written Complaint as an Escalated Complaint, if, after  a verbal or written Complaint is referred to a supervisor or manager:

    a.      The complainant asks to speak with a higher-ranking employee;

    b.      The Supervisor or manager does not have the authority or ability to resolve the Complaint;

    c.      The supervisor or manager does not resolve the Complaint within seven business days of receiving the Complaint; or

    d.      The complainant expresses frustration or dissatisfaction, expresses that the Complaint has not been resolved, expresses that the resolution offered is wrong or unacceptable, expresses that he or she has complained of the same issue in the past or that the Complaint is recurring, or requests further assistance or investigation regarding the Complaint.

C.    Escalated Complaints.

1.      Within five business days of receiving an Escalated Complaint, Servicer shall provide to the complainant a written response acknowledging receipt of the Escalated Complaint, unless Servicer corrects the error or errors asserted in the Escalated Complaint and notifies the complainant of that correction in writing within five business days. The acknowledgement shall include:

    a.      A statement that the Servicer must provide a written response resolving the Escalated Complaint within 30 business days of receiving the Escalated Complaint, and a statement that Servicer may extend the time period for responding by an additional 15 business days if, before the end of the 30-day period, Servicer notifies the complainant of the extension and the reasons for the extension in writing; and

b.  Contact information, including a toll-free telephone number, for further assistance.

2.  Upon receipt of an Escalated Complaint, Servicer shall cease collection of any amount alleged to be in error until Servicer has investigated and responded to the Escalated Complaint. If Servicer has determined that no error has occurred, it may resume collection of amounts, including amounts that accrued during the investigation period.

3.  Servicer shall promptly and accurately investigate and respond to Escalated Complaints within 30 business days of receiving the Escalated Complaint. Investigation and response includes correction of any errors identified with the complainant's account, including errors discovered in the course of investigation other than those alleged by the complainant, and remedial or other action necessary to resolve the Escalated Complaint. Servicer may extend the time period for responding to an Escalated Complaint by one additional period of 15 business days if, before the end of the 30 business day period, it notifies the borrower of the extension and the reasons for the extension in writing.

4.  Servicer's investigation of an Escalated Complaint shall be based on all relevant documents and information in its possession, custody, or control or that is reasonably accessible to Servicer.

5.  If Servicer determines as a result of its investigation of an Escalated Complaint that no error occurred based in whole or in part on a lack of documents or information, and if Servicer can identify what documents or information are necessary to determine if an error occurred, it shall provide the borrower with notice as to the missing information or documentation.

6.  If Servicer concludes as a result of its investigation of an Escalated Complaint that an error occurred, it shall immediately correct all errors and restore the complainant's account to the position it would be in if Servicer had not made the error, including reversing and refunding any fees, charges, or other amounts incurred as a result of the error and correcting any subsequent payment misapplication or credit reporting arising from the error.

7.  Servicer shall provide a complainant with written notification of its resolution of an Escalated Complaint within the time period specified in paragraph VIII.C.3. The notification shall include contact information, including a toll-free telephone number, for further assistance, and shall:

a.  Notify the complainant of the corrections made, remedial actions taken, or other actions taken to resolve the Escalated Complaint, including the effective date of such corrections and/or actions; or

b.  State Servicer's basis for its resolution, including the findings that led Servicer to determine that there was insufficient basis to conclude that an error or improper act occurred, a statement that the complainant may request documents relied upon by Servicer in

A-45

reaching its determination, and information regarding how the complainant can request such documents.

8. Upon request by a complainant who submitted an Escalated Complaint, Servicer shall provide, at no charge, copies of documents and information relied upon by Servicer in making its determination that no error occurred within 15 business days of receiving such request. Servicer is not required to provide documents that constitute confidential, proprietary, or privileged information. If Servicer withholds confidential, proprietary, or privileged information, it shall notify the complainant of its determination in writing within 15 business days of receiving the complainant's request for such documents. In its response to a request for documentation, Servicer may omit location and contact information and personal financial information (other than information about the terms, status, and payment history of the mortgage loan) if: (i) the information pertains to a potential or Confirmed Successor in Interest who is not the requestor; or (ii) the requestor is a Confirmed Successor in Interest and the information pertains to any borrower who is not the requestor.

D. Documentation and Tracking.

1. Servicer shall document in its system of record the receipt of, investigation of, and response to Complaints and Escalated Complaints, including additional information received and communications regarding Complaints and Escalated Complaints.

2. Servicer shall maintain adequate systems and processes to track the status of Complaints and Escalated Complaints and, upon complainant request, provide accurate and timely information regarding the complainant's Complaint or Escalated Complaint.

3. Servicer shall maintain documentation of the receipt of, investigation of, and response to Complaints and Escalated Complaints.

4. Unless otherwise prohibited by law, Servicer shall record and maintain all inbound and outbound calls to and from complainants, and shall maintain such recordings and call information in a manner allowing for retrieval and production of such information and recordings upon any specific request by the Parties of this Agreement. If so requested, such retrieval and production shall be made within two weeks, or a shorter time period if specified by or allowable under applicable state law or regulation.

## IX. GENERAL SERVICER DUTIES AND PROHIBITIONS.

A. Measures to Deter Community Blight.

1. Servicer shall develop and implement policies and procedures to ensure that REO properties do not become blighted.

2. As indicated in paragraph I.A.13, Servicer shall (a) inform borrower that if the borrower continues to occupy the property, he or she has responsibility to maintain the property, and an obligation to ensure that taxes are paid,

until a sale or other title transfer action occurs; and (b) request that if the borrower does not wish to continue to occupy the property, he or she contact Servicer to discuss alternatives to foreclosure under which borrower can surrender the property to Servicer in exchange for possible compensation.

3. When Servicer makes a determination not to pursue foreclosure action on a property, Servicer shall, within 30 days, by written and electronic means (if available):

a. Notify the borrower of Servicer's decision to not pursue foreclosure, and inform borrower about his or her right to occupy the property until a sale or other title transfer action occurs; and

b. Notify local authorities, such as courts or code enforcement departments, when Servicer decides to not pursue foreclosure.

B. Borrowers with Limited English Proficiency ("LEP").

1. Servicer shall develop, maintain, and implement policies and procedures related to borrowers with LEP. Servicer shall ensure that its services provided to LEP borrowers are consistent with its policies and procedures.

2. Servicer shall provide translation services which shall be available to assist LEP borrowers on an as-needed basis.

3. When evaluating borrowers for loss mitigation options, Servicers shall accept hardship letters and state and federal government forms that are in a language other than English.

4. Servicer shall require its vendors for mortgage servicing activities which require regular interaction with borrowers to develop, maintain, and implement reasonable policies and procedures related to borrowers with LEP.

C. Whistleblower Provision.

Servicer shall maintain policies and procedures encouraging employees at any level to report, without repercussion or retaliation, to senior management level employees independent from the servicing operation any actual or potential deficiencies or issues that arise with regard to Servicer's mortgage servicing operations, duties, and responsibilities, including those arising under this Agreement. Such policies and procedures shall include the maintenance of a toll-free hotline and allow for anonymous reporting.

X. **GENERAL PROVISIONS, DEFINITIONS, AND IMPLEMENTATION.**

A. Applicable Requirements.

1. The servicing standards set forth in this Agreement and any modifications or other actions taken in accordance with these servicing standards are expressly subject to, and shall be interpreted in accordance with, (a) applicable federal, state, and local laws, rules, and regulations, including, but not limited to, any requirements of the state and federal banking regulators, (b) the terms of the applicable mortgage loan documents, (c) Section 201 of the Helping Families Save Their Homes Act of 2009, (d) the

terms and provisions of the Servicer Participation Agreement with the Department of Treasury, (e) any servicing agreement, subservicing agreement under which Servicer services for others, special servicing agreement, mortgage or bond insurance policy or related agreement or requirements to which Servicer is a party and by which it or its servicing is bound pertaining to the servicing or ownership of the mortgage loans, including without limitation the requirements, binding directions, or investor requirements of the applicable investor (such as Fannie Mae or Freddie Mac), mortgage or bond insurer, or credit enhancer, and (f) no-contact or cease-and-desist requests made by borrowers (collectively, the "Applicable Requirements").

2.  In the event of a conflict between the requirements of this Agreement and the Applicable Requirements with respect to any provision of this Agreement such that Servicer cannot comply without violating Applicable Requirements or being subject to adverse action, including fines and penalties, Servicer shall document such conflicts and notify the Executive Committee that it intends to comply with the Applicable Requirements to the extent necessary to eliminate the conflict.

B.   3.  Unless otherwise specified, Servicer shall maintain all of the records, reports, recordings, data, and documentation referenced in this Agreement for the duration of this Agreement.   Applicable Dates for Written Communications Required by this Agreement.

1.  Servicer shall date all written communication to borrowers, occupants, Successors in Interest, and Potential Successors in Interest, and Servicer shall promptly mail all written communication to the recipient.

2.  Servicer shall ensure that its third party vendor mail all written communications to borrowers, occupants, Successors in Interest, and Potential Successors in Interest in accordance with its third party vendor contracts. 3. Servicer shall maintain records of mailing of all written communications in a form and manner that is accessible to the Executive Committee.

C.   Duty to Notify.

1.  Unless prohibited by law, Servicer shall notify the Executive Committee in writing within 15 days after Servicer receives notification of  license denial, cease and desist, suspension or revocation procedures, or other formal regulatory action in any state, or within 15 days of the initiation of any action by the Attorney General of any state related to residential mortgage servicing or within 15 days of settlement agreement or other form of consensual resolution, or entry of judgment in any administrative, civil, or criminal investigation or action by any state or federal authority, provided that such violation of law, investigation, or action pertains to residential mortgage servicing.

2.  Servicer shall provide such additional information as may be requested by the Executive Committee, including, but not limited to, copies of

correspondence pertaining to the investigation, on-going updates, and copies of any resulting pleadings, judgments, or orders, that are not privileged or subject to a confidentiality agreement.

3.    In the event that Servicer intends to operate or utilize an auction business, or to require borrowers to use auction websites, Servicer shall, prior to implementation, give the Executive Committee 90 days' notice of its intent to do so.

D.    Definitions.

1.    In each instance in this Agreement in which Servicer is required to ensure adherence to, or undertake to perform certain obligations, it is intended to mean that Servicer shall (a) authorize and adopt such actions on behalf of Servicer as may be necessary for Servicer to perform such obligations and undertakings; (b) follow up on any material non-compliance with such actions in a timely and appropriate manner; (c) require corrective action be taken in a timely manner of any material non-compliance with such obligations; and (d) take appropriate remedial steps if deficiencies are identified, including appropriate remediation in individual cases.

2.    References to Servicer shall mean PHH Mortgage Corporation. The provisions of this Agreement shall not apply to those divisions or major business units of Servicer that are not engaged as a primary business in customer-facing servicing of residential mortgages on owner-occupied one-to-four family properties on its own behalf or on behalf of investors. The provisions of this Agreement shall not bind any successors or assigns, future purchasers of all or substantially all of the assets of PHH Corporation or PHH Mortgage Corporation or successors-in-interest of PHH Corporation or PHH Mortgage Corporation. Notwithstanding the foregoing, in the event of the sale of Servicer's servicing/subservicing platform, Servicer will work with the government signatories to ensure an orderly transition of serviced loans to any new servicer/subservicer of such loans.

# EXHIBIT B

## DISTRIBUTION OF BORROWER PAYMENT AMOUNT

1.        The Borrower Payment Amount shall be administered under the direction and control of the Executive Committee in the following manner.

2.        Within thirty (30) days of the Effective Date of this Consent Judgment, the Executive Committee shall choose and retain a Settlement Administrator ("the Administrator") to administer the distribution of cash payments to individual Borrowers under this Consent Judgment.  All costs and expenses of the Administrator, including taxes, shall be paid from the Borrower Payment Amount.

3.        Defendant shall provide to the Administrator all information already in its possession and readily available that is reasonably necessary for the administration of this Consent Judgment, within a reasonable time after receipt of the request for information. Defendant is ordered herein to provide such information under 15 U.S.C. § 6802(e)(1)(A), (5) and (8) of the Gramm-Leach-Bliley Act.  Such information pertaining to individual eligible Borrowers, including names and other identifying information, may be provided to individual states, but only if the information is used by the individual states or their authorized representative solely for the purpose of contacting eligible Borrowers, responding to inquiries from Borrowers regarding their eligibility or concerning the award of Borrower payments under this Consent Judgment, and/or complying with tax reporting and withholding obligations, if any. The Administrator shall utilize appropriate information security protocols to ensure the privacy of Borrower information and otherwise comply with all applicable privacy laws.  After the completion of the Borrower Payment process, upon request the Administrator shall provide a report to Defendant identifying which Borrowers have received payment.  In addition, Defendant may request from the Administrator such interim reports as may be deemed reasonable by the

Executive Committee and such agreement, consent, or approval shall not be unreasonably withheld. Interim reports necessary to ensure that Borrowers will not receive duplicate payments by virtue of litigation, the foreclosure payments required by federal banking agencies, or otherwise, hereby are deemed reasonable.  Defendant shall warrant to the Executive Committee at the time of supplying information to the Administrator that the information is complete and accurate to the best of its knowledge and capability.  Defendant's duty to supply complete and accurate information, to the best of its knowledge and capability, regarding eligible Borrowers shall continue throughout the administration process.

4.      The Administrator shall permit reasonable onsite inspection by the Executive Committee on the premises of the Administrator to monitor administration of this Consent Judgment.

5.      As a condition to receipt of any payments pursuant to this process, Borrowers must agree that such payment shall offset and operate to reduce any other obligation Defendant or Defendant's affiliates or subsidiaries have to the Borrowers to provide compensation or other payments.  However, Borrowers shall not be required to release or waive any other right or legal claim as a condition of receiving such payments.

6.      Any cash payment to individual Borrowers awarded under the terms of this Consent Judgment is not and shall not be considered as forgiven debt.

7.      For Borrowers who lost their home to foreclosure, the purposes of the payments described in this Exhibit B are remedial and relate to the reduction in the proceeds deemed realized by Borrowers for tax purposes from the foreclosure sale of residential properties owned by the Borrowers allegedly resulting from the allegedly unlawful conduct of the Defendant.

8.      In accordance with written instructions from the Executive Committee, the

Defendant shall make thirty-one million, four hundred and fifty-six thousand, two hundred and ten dollars ($31,456,210) of the Settlement Amount available to the Administrator to provide cash payments to (a) Borrowers whose loans were serviced by Defendant at the time the foreclosure was completed and whose homes were sold or taken in foreclosure between and including January 1, 2009, and December 31, 2012 or (b) all other Borrowers whose loans were serviced by Defendant and referred to foreclosure during that same time period and not accounted for in (a) above; who submit claims allegedly arising from the Covered Conduct (as that term is defined in Exhibit C hereto); and who otherwise meet criteria set forth by the Executive Committee; and to pay the reasonable costs and expenses of a Settlement Administrator, including taxes and fees for tax counsel, if any.  Any amounts made available hereunder remain a part of the Qualified Settlement Fund until distributed to Borrowers and shall be administered in accordance with the terms set forth in this Exhibit B.

9.      Interest earned on amounts held in the Qualified Settlement Fund, if any, may be used, at the discretion of the Executive Committee, to pay the costs and expenses of administration (including taxes), for Borrower payments, or for any other housing-related purpose.

10.      The Administrator is responsible for ensuring that any uncashed checks that have passed their stale date, issued to Borrowers entitled to payment from the Borrower Payment Amount shall be escheated to the state of the Borrower's last known address so that such Borrower, or such Borrower's rightful heirs, will maintain their ability to claim such payment pursuant to that state's processes for collecting unclaimed funds.

# EXHIBIT C

# RELEASE

## I.      Covered Conduct

For purposes of this Release, the term "Covered Conduct" means residential mortgage loan servicing and residential mortgage foreclosure services, as defined below.  For the purposes of this Release, Released Parties shall include PHH Mortgage Corporation ("Defendant" or "PHH"), including PHH's current and former parent corporations or other forms of legal entities, direct and indirect subsidiaries, brother or sister corporations or other forms of legal entities, divisions or affiliates, and the predecessors, successors, and assigns of any of them, as well as the current and former directors, officers, and employees of any of the foregoing.

For purposes of this Section I only, the term Released Parties includes agents (including, without limitation, third party vendors) of the Released Parties and the Released Parties are released from liability for the covered conduct acts of their agents (including, without limitation, third-party vendors).  This Release does not release the agents (including, without limitation, third-party vendors) themselves for any of their conduct.  For purposes of this Release, the term "residential mortgage loans" means loans secured by one- to four- family residential properties, irrespective of usage, whether in the form of a mortgage, deed of trust, or other security interest creating a lien upon such property or any other property described therein that secures the related mortgage note.

For purposes of this Release, the term "residential mortgage loan servicing" means all actions, errors or omissions of the Released Parties, arising out of or relating to servicing (including subservicing and master servicing) of residential mortgage loans from and after the closing of such loans, whether for the Released Parties' account or for the account of others,

including, but not limited to, the following: (1) Loan modification and other loss mitigation activities, including, without limitation, extensions, forbearances, payment plans, short sales and deeds in lieu of foreclosure, and evaluation, approval, denial, and implementation of the terms and conditions of any of the foregoing; (2) Communications with borrowers relating to borrower accounts, including, without limitation, account statements and disclosures provided to borrowers; (3) Handling and resolution of inquiries, disputes or complaints by or on behalf of borrowers; (4) Collection activity related to delinquent borrower accounts; (5) Acceptance, rejection, application or posting of payments made by or on behalf of borrowers, including, without limitation, assessment and collection of fees or charges, placement of payments in suspense accounts and credit reporting; (6) Maintenance, placement or payment (or failure to make payment) of any type of insurance or insurance premiums, or claims activity with respect to any such insurance; (7) Payment of taxes, homeowner association dues, or other borrower obligations, and creation and maintenance of any escrow accounts; (8) Use, conduct or supervision of vendors, agents and contract employees, whether affiliated or unaffiliated, including, without limitation, sub-servicers and foreclosure and bankruptcy attorneys, in connection with servicing, loss mitigation, and foreclosure activities; (9) Adequacy of staffing, training, systems, data integrity or security of data that is related to the servicing of residential mortgage loans, foreclosure, bankruptcy, and property sale and management services; (10) Securing, inspecting, repairing, maintaining, or preserving properties before and after foreclosure or acquisition or transfer of title; (11) Servicing of residential mortgage loans involved in bankruptcy proceedings; (12) Obtaining, executing, notarizing, endorsing, recording, providing, maintaining, registering (including in a registry system), and transferring promissory notes,

mortgages, or mortgage assignments or other similar documents, or transferring interests in such documents among and between servicers and owners, and custodial functions or appointment of officers relating to such documents; (13) Decisions on disposition of residential mortgage loans, including, without limitation, whether to pursue foreclosure on properties, whether to assert or abandon liens and other claims and actions taken in respect thereof, and whether to pursue any particular loan modification or other form of loss mitigation; (14) Servicing of residential mortgage loans of borrowers who are covered by federal or state protections due to military status; (15) Licensing or registration of employees, agents, vendors or contractors, or designation of employees as agents of another entity; (16) Quality control, quality assurance, compliance, audit testing, oversight, reporting, or certification or registration requirements related to the foregoing; and (17) Trustee functions related to the servicing of residential mortgage loans.

For purposes of this Release, the term "residential mortgage foreclosure services" means all actions, errors or omissions of the Released Parties arising out of or relating to foreclosures on residential mortgage loans, whether for the Released Parties' own account or for the account of others, including, but not limited to, the following: (1) Evaluation of accounts for modification or foreclosure referral; (2) Maintenance, assignment, recovery and preparation of documents that have been filed or otherwise used to initiate or pursue foreclosures, and custodial actions related thereto; (3) Drafting, review, execution and notarization of documents (including, but not limited to, affidavits, notices, certificates, substitutions of trustees, and assignments) prepared or filed in connection with foreclosures or sales of acquired properties, or in connection with remediation of improperly filed documents; (4) Commencement, advancement and finality of foreclosures, including, without limitation, any issues relating to standing, fees, or notices; (5) Acquisition of

title post-foreclosure or in lieu of foreclosure; (6) Pursuit of pre- and post-foreclosure claims by

the Released Parties, including, without limitation, the seeking of deficiency judgments when

permitted by law, acts or omissions regarding lien releases, and evictions and eviction

proceedings; (7) Management, maintenance, and disposition of properties in default or properties

owned or controlled by the Released Parties, whether prior to or during the foreclosure process

or after foreclosure, and executing, notarizing, or recording any documents related to the sale of

acquired properties; (8) Quality control, quality assurance, compliance, audit testing, oversight,

reporting, or certification or registration requirements related to the foregoing; and (9) Trustee

functions related to the foreclosure of residential mortgage loans.

## II.      Release of Covered Conduct

By their execution of this Consent Judgment, the Attorneys General that are parties to

this Consent Judgment release and forever discharge the Released Parties from the following:

any civil or administrative claim, of any kind whatsoever, direct or indirect, that an Attorney

General has or may have or assert, including, without limitation, claims for damages, fines,

injunctive relief, remedies, sanctions, or penalties of any kind whatsoever based on, arising out

of, or resulting from the Covered Conduct occurring between January 1, 2009, and December 31,

2012, as well as for all findings in the Multi-State Examination that was commenced on

December 20, 2010,  except for claims and the other actions set forth in Section III below

(collectively, the "Released Claims").

This Release does not release any claims against any entity other than the Released

Parties as defined in Section I above.

### III.     Claims and Other Actions Exempted from Release

Notwithstanding the foregoing and any other term of this Consent Judgment, the following claims are hereby not released and are specifically reserved:

1.      Securities and securitization claims based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities, regardless of the factual basis of the claim, including such claims of the state or state entities as an owner, purchaser, or holder of whole loans, securities, derivatives or similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations, or structured investment vehicles, and including, but not limited to, such claims based on the following:

a.      the creation, formation, solicitation, marketing, assignment, transfer, offer, sale or substitution of securities, derivatives, or other similar investments, including, without limitation, mortgage backed securities, collateralized debt obligations, collateralized loan obligations, or structured investment vehicles;

b.      representations, warranties, certifications, or claims made regarding such securities or investments, such as representations, warranties, certifications or claims regarding origination, funding, and underwriting activities, and including the eligibility, characteristics, or quality of the mortgages or the mortgagors;

c.      the transfer, sale, conveyance, or assignment of mortgage loans to, and the purchase and acquisition of such mortgage loans by, the entity creating, forming and issuing the securities, derivatives or other similar investments relating to such mortgage loans;

      d.     all servicing-, foreclosure-, and origination-related conduct, but solely to the extent that such claims are based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities; and

      e.     all Covered Conduct, but solely to the extent that such claims are based on the offer, sale, or purchase of securities, or other conduct in connection with investors or purchasers in or of securities.

For avoidance of doubt, securities and securitization claims based on the offer, sale, or purchase of securities, or other conduct occurring in connection with investors or purchasers in or of securities, that are based on any source of law, including, but not limited to, false claims acts or equivalent laws, securities laws, and common law breach of fiduciary duty, are not released.

2.     Claims against a trustee or custodian or an agent thereof based on or arising out of the conduct of the trustee, custodian or such agent related to the pooling of residential mortgage loans in trusts, mortgage backed securities, collateralized debt obligations, collateralized loan obligations, or structured investment vehicles, including, but not limited to, the performance of trustee or custodial functions in such conduct.

3.     Liability based on PHH's obligations created by this Consent Judgment.

4.     Claims arising out of alleged violations of fair lending laws that relate to discriminatory conduct in lending.

5.     Claims of state, county and local pension or other governmental funds as investors (whether those claims would be brought directly by those pension or other governmental funds or by the Office of the Attorney General as attorneys representing the pension or other governmental funds).

6.      Tax claims, including, but not limited to, claims relating to real estate transfer taxes.

7.      Claims of county and local governments and claims or disciplinary proceedings of state regulatory agencies having specific regulatory jurisdiction that is separate and independent from the regulatory and enforcement jurisdiction of the Attorney General.

8.      Claims of county recorders, city recorders, town recorders or other local government officers or agencies (or, for Hawaii only, where a statewide recording system is applicable and operated by the state, claims by Hawaii; and for Maryland, where the recording system is the joint responsibility of the counties or Baltimore City and the state, claims of the counties or Baltimore City and the state), for fees relating to the recordation or registration process of mortgages or deeds of trust, including assignments, transfers, and conveyances, regardless of whether those claims would be brought directly by such local government officers or agencies or through the Office of the Attorney General as attorneys representing such local government officers or agencies.

9.      Claims and defenses asserted by third parties, including individual mortgage loan borrowers on an individual or class basis.

10.     Claims seeking injunctive or declaratory relief to clear a cloud on title where the Covered Conduct has resulted in a cloud on title to real property under state law; provided, however, that the Attorneys General shall not otherwise take actions seeking to invalidate past mortgage assignments or foreclosures in connection with loans serviced and/or owned by the Released Parties.  For the avoidance of doubt, nothing in this paragraph 10 releases, waives or bars any legal or factual argument related to the validity of past mortgage assignments or

foreclosures that could be made in support of claims not released herein, including, without limitation, all claims preserved under paragraphs 1 through 13 of Section III of this Release.

11.     Authority to resolve consumer complaints brought to the attention of PHH by the state Attorneys General.

12.     Claims for violation of state or federal law relating to residential mortgage loan origination.

13.     Claims for conduct discovered by Defendant during the course of its internal audit in June 2014 and the resulting remediation process regarding a flaw in its automated system to pay default counsel fees and costs, except that any claims for civil money penalties in connection with this issue are released.

# EXHIBIT D

## EXHIBIT D

## ARIZONA

Pursuant to Section III, Paragraph 7 of the Consent Judgment, payment to Arizona for attorneys' fees and costs shall be made by wire transfer, a cashier's check, or other certified funds, made payable to the State of Arizona. Arizona's payment of $390,000 shall be deposited in the Consumer Protection-Consumer Fraud Revolving Fund, pursuant to A.R.S. § 44-1531.01, and used in the sole discretion of the Arizona Attorney General for consumer protection investigative and enforcement operations.

## CALIFORNIA

Payments to California shall be made to the California Attorney General and allocated as follows:

a)      Ten percent of the payment shall be paid as a civil penalty pursuant to Section 17206 of the Business and Professions Code and deposited in the Unfair Competition Law Fund;

b)      $100,000 shall be deposited with the Consumer Protection Prosecution Trust Fund previously created by the Stipulated Final Judgment and Permanent Injunction, filed on September 21, 1989, in the case of People v. ITT Consumer Financial Corporation (Alameda County Superior Court case number 656038-0); and

c)      The remainder shall be used for the California Attorney General's enforcement of consumer protection laws, at the sole discretion of the California Attorney General.

## COLORADO

All payments are to be held, along with any interest thereon, in trust by the Attorney General to be used in the Attorney General's sole discretion for reimbursement of the State's actual costs and attorneys' fees, the payment of restitution, if any, and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.

## CONNECTICUT

Pursuant to Section III, Paragraph 7 of the Consent Judgment, payment to Connecticut of $390,000 for attorneys' fees shall be made by wire transfer pursuant to instructions to be provided by the Connecticut Office of the Attorney General.  Such payment shall be deposited into the State of Connecticut General Fund.

## FLORIDA

Pursuant to Section III, Paragraph 7 of the Consent Judgment, the $390,000 payment to Florida for attorneys' fees shall be made by wire transfer, a cashier's check, or other certified funds, made payable to the Department of Legal Affairs Revolving Trust Fund. The payment shall be deposited in the Department of Legal Affairs Revolving Trust Fund, in accordance with Section 501.2101(1), Florida Statutes.

## ILLINOIS

PHH shall make payment to the "Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund" in the amount of $390,000 by wire transfer, pursuant to instructions provided by the Illinois Attorney General's Office. This payment shall be deposited into the Attorney General Court Ordered and Voluntary Compliance Payment Projects Fund for subsequent expenditure as authorized by the Illinois Attorney General. PHH shall not be entitled to further accounting regarding the money deposited into the Court Ordered Fund.

## IOWA

PHH shall pay $550,000.00 to the Attorney General of Iowa by electronic funds transfer according to written instructions received from the Attorney General of Iowa. The payment shall be used at the sole discretion of the Attorney General of Iowa for any use permitted by law and this Consent Judgment, including but not limited to:  public education and litigation relating to consumer fraud, mortgage, housing, and financial issues, including enforcement of Iowa Code section 714.16, or for any other lawful purpose.

## NEVADA

Pursuant to Section III, Paragraph 7 of the Consent Judgment, the Nevada Attorney General shall receive a payment of Three Hundred, Ninety Thousand dollars ($390,000) via wire transfer.  These funds shall be used at the sole discretion of the Nevada Attorney General for any use permitted by state law, including but not limited to attorneys' fees and other costs, consumer protection purposes, or for any other lawful purpose.

## NORTH CAROLINA

Pursuant to Section III, Paragraph 7 of the Consent Judgment, North Carolina's payment of $390,000 shall be used for attorneys' fees and other costs, consumer protection purposes, and other purposes allowed by state law, in the discretion of the North Carolina Attorney General.

## OHIO

Pursuant to Section III, Paragraph 7 of the Consent Judgment, Ohio's payment of $390,000 shall be distributed and delivered to the office of the Ohio Attorney General, and shall be placed in the Consumer Protection Enforcement Fund created pursuant to section 1345.51 of the Ohio Revised Code. The funds shall be used for the purposes described in Ohio Revised Code section 1345.51.

## TEXAS

Pursuant to Section III, Paragraph 7 of the Consent Judgment, Texas's payment of $550,000 for reimbursement of attorney's fees shall be paid to the Texas Attorney General.  Payment instructions will be supplied to Defendant by the Texas Attorney General.

## WASHINGTON

Pursuant to Section III, Paragraph 7 of the Consent Judgment, Washington's payment of $390,000 shall be used for costs and reasonable attorney's fees incurred by Washington in pursuing this matter, for monitoring and potential enforcement of this Consent Decree, for future enforcement of RCW 19.86, or for any lawful purpose in the discharge of the Attorney General's duties at the sole discretion of the Attorney General.